Washington Park Cemetery Association, Inc. v. Commissioner.
Washington Park Cemetery Asso. v. Commissioner
Docket No. 90670.
United States Tax Court
T.C. Memo 1963-268; 1963 Tax Ct. Memo LEXIS 74; 22 T.C.M. (CCH) 1345; T.C.M. (RIA) 63268; September 30, 1963
Robert T. Molloy, 602 Transportation Bldg., Washington, D.C., Paul H. Buchanan, Jr., and Grant W. Wiprud, for the petitioner. John J. Larkin and Howard K. Schwartz, for the respondent. KERN Memorandum Findings of Fact and Opinion Respondent determined deficiencies and additions to tax in petitioner's Federal income taxes for the period and years and in the amounts as follows: Additions
to Tax
Period and/or
Sec. 6651,
Years Ended
Deficiency
1954 Code
May 25, 1956,
to
April 30, 1957
$19,845.01
$ 4,961.25
April 30, 1958
50,499.67
12,624.92
April 30, 1959
38,865.16
9,716.29
The primary issue presented for our decision in is whether respondent erred in determining that petitioner was not tax exempt in accordance with the provisions of section 501(a) and (c)( 13) of the Internal Revenue Code of 1954. If the issue *76 is resolved in favor of the respondent, we must also decide whether respondent's other determinations are correct. The Commissioner determined that the petitioner acquired its assets in a transfer governed by section 351 of the Internal Revenue Code. As a result of this determination, the Commissioner determined, by application of section 362 of the Internal Revenue Code of 1954, that the basis of petitioner's assets was the same as the basis of the assets in the hands of the transferor. Accordingly, for each of the fiscal years in issue, respondent increased petitioner's installment sales income, charged petitioner with income from purchased contracts and receivables, and reduced the amount of depreciation deductions claimed. Respondent also determined an addition to tax pursuant to section 6651(a) of the Internal Revenue Code of 1954 for the period and fiscal years involved. The correctness of this determination must also be decided if we decide the primary issue in favor of respondent. Findings of Fact Some of the facts have been stipulated and the stipulation of facts, together with the exhibits attached *77 thereto, is incorporated herein by this reference. Petitioner, Washington Park Cemetery Association, Inc., sometimes hereinafter referred to as Washington Park, is a corporation which was organized in 1956 and has since been operating under the Indiana General Not for Profit Corporation Act of 1935, as amended. [1] Petitioner was organized for the purpose of acquiring and operating cemetery properties and to conduct activities necessary and incidental to the operation of cemetery properties. Petitioner's main office and principal place of business is located in Marion County, Indiana. It maintains its books and records on the basis of a fiscal year ending April 30. It has elected to report income from the sale of burial space on the installment method, and the accrual method of accounting is used for its other operations. Petitioner was organized to operate the Washington Park Cemetery in Indianapolis, Indiana, which was previously owned and operated by Indiana Cemetery Corporation, sometimes hereinafter referred to as Indiana Corporation, a for-profit corporation. Indiana Corporation's president and chief executive officer *78 became inactive sometime in 1949 for reasons of failing health. Most of its other officers resided in Chicago. As a result the cemetery was not managed well and sufficient funds were not available to maintain the cemetery to the extent considered desirable by the management. During the period from 1950 through 1955 an average of approximately 1,000 graves per year were sold by Indiana Corporation. Although Washington Park Cemetery was considered one of the outstanding cemeteries in the community as of the spring of 1956, no substantial improvements to the buildings or grounds were made by Indiana Corporation during the final years in which it operated the cemetery. At that time the management of Indiana Corporation considered it desirable to build more hardsurfaced roads, to make minor repairs to those already laid, to remove the residue from and deepen a lake on the grounds, and to make certain small repairs to the roof of the administration building on the property and to the drains. Indiana Corporation's operations are summarized as follows for the years indicated: 1950
1951
1952
Gross Income
$172,297.82
$178,259.34
$183,527.08
Total Expenses
137,053.95
151,161.93
177,307.73
Net Income (Loss) before
Federal Income Taxes
35,243.87
27,097.41
6,219.35
Federal Income Tax Lia-
bility
10,052.43
8,251.94
1,865.81
Profit after Taxes
25,191.44
18,845.47
4,353.54
Total Lot Sales (In Dollars)
102,780.60
[1]
104,029.50
Ratio of Lot Sales Income
to Profit before Taxes [2]
34%
[1]
6%
*79 1953
1954
1955
Gross Income
$185,011.83
$142,553.14
$150,320.04
Total Expenses
174,980.17
151,834.40
138,054.31
Net Income (Loss) before
Federal Income Taxes
10,031.66
(9,281.26)
12,265.73
Federal Income Tax Lia-
bility
3,009.50
3,679.72
Profit after Taxes
7,022.16
8,586.01
Total Lot Sales (In Dollars)
110,183.27
76,172.32
76,496.81
Ratio of Lot Sales Income
to Profit before Taxes [2]
10%
16%
Paul H. Buchanan, Jr., sometimes hereinafter referred to as Buchanan, Jr., on behalf of himself and his father, Paul H. Buchanan, Sr., sometimes hereinafter referred to as Buchanan, and his brother-in-law, Donald B. Keller, sometimes hereinafter referred to as Keller, negotiated with the stockholders of Indiana Corporation for the purchase of Washington Park Cemetery. Buchanan, Jr., Buchanan, and Keller will sometimes hereinafter be referred to as the syndicate. The stockholders of Indiana Corporation wanted to sell their stock to the syndicate. However, it was later determined that the stockholders of Indiana Corporation were scattered and the identity of many stockholders *80 was unknown on account of deaths. For these reasons the syndicate refused to buy the stock and insisted that the transaction be cast in the form of a purchase of assets. On January 6, 1956, Buchanan, Jr., executed an offer to purchase the assets of Indiana Corporation on behalf of himself or his nominee or nominees. The offer was endorsed with an acceptance dated February 17, 1956, which was executed on behalf of Indiana Corporation by its president and secretary. The purchase of the assets of Indiana Corporation was consummated on May 25, 1956, by Paul H. Buchanan, Jr., and his nominees, Buchanan and Keller. Pursuant to the agreement, the purchasers acquired all the land that was owned by Indiana Corporation, consisting of approximately 102 acres. The land was conveyed to the members of the syndicate as joint tenants with the right of survivorship in a deed dated May 25, 1956, and recorded on August 28, 1958. The improvements on the land which were conveyed to the syndicate included an administration building, a community mausoleum, and embellishments in the cemetery. An embellishment is a statute, monument, or plaque of religious significance, customarily found in cemeteries, which *81 add beauty to a cemetery and serve to inspire religious feeling in visitors to a cemetery. The purchasers also acquired the right to use of the name, Washington Park Cemetery, or mausoleum, or any variant thereof. The administration building which consisted of one and one-half stories and a full basement, suitable for use for temporary entombments, was constructed of Indiana limestone, concrete, and steel. The community mausoleum, which was a 2,400-crypt building, was constructed of limestone, concrete, steel, bronze, and granite. It also contained a two-retort crematory unit, a large chapel, and a small chapel, both of which were constructed of stone, marble, and bronze, and which were attractively decorated with the necessary drapes, oriental rugs, upholstered chairs, and other furnishings. The reproduction cost of the two chapels would have been $150,000 in 1956. The purchase price, pursuant to the agreement, was $185,093.40 in cash, plus the assumption of certain liabilities. The net cash outlay by the purchasers, however, was $179,748.73, as a result of the transfer of Indiana Corporation's general account and mausoleum account to the purchasers. The amounts paid by the purchasers *82 and the amounts transferred to the purchasers were as follows: Monies paid by purchasers: Escrow fee
$ 25.00
Escrow deposit
10,000.00
Purchase price
185,093.40
Land contract payable
5,532.00
Directors' notes payable
1,088.81
Directors' notes payable
534.77
Directors' notes payable
2,138.93
Directors' notes payable
1,069.66
Directors' notes payable
4,920.48
Mortgage payable
36,770.43
Total
$247,173.48
Cash received by purchasers: General account - In-
diana Corporation
$43,300.70
Sinking fund account -
Indiana Corporation
691.39
Mausoleum account - In-
diana Corporation
12,641.09
Return of escrow deposit
10,000.00
Repayment of loan
791.57
Total
67,424.75
Net cash outlay
$179,748.73
The cash was paid by the members of the syndicate from their own funds and amounts they individually borrowed from banks. Pursuant to an agreement among the members of the syndicate dated February 17, 1956, Buchanan provided $100,000 in cash for the venture. Buchanan, Jr., and Keller each provided $41,500 for the venture. The agreement provided that the parties would jointly obtain a bank loan in the amount of $35,000 to $40,000 in order *83 to have available sufficient funds to complete the purchase and satisfy all obligations required by the purchase agreement, but Buchanan was relieved from any liability on the joint bank loan by the other members of the syndicate. The parties agreed that after each had recovered his original investment in the venture Buchanan was to receive a preference in the realization of any profit from the sale of the assets acquired from Indiana Corporation. In return for the preference given to Buchanan it was agreed that Buchanan, Jr., and Keller were to own in their own right any assets unsold still held by the parties after any sale of the assets was completed. The members of the syndicate had no connection or interest whatsoever with or in the Indiana Corporation and the purchase of Indiana Corporation's assets by the syndicate was an arm's length transaction. Petitioner was incorporated on May 17, 1956, for the purpose of acquiring and operating Washington Park Cemetery and providing incidental services thereto. Its articles of incorporation provided that: The cemetery or cemeteries owned by the corporation shall be operated exclusively for the benefit of the lot owners thereof and *84 shall not be operated for profit; no part of the net earnings of the corporation shall enure to the benefit of any member or individual. The articles of incorporation also provided that upon dissolution and liquidation of petitioner any property or moneys remaining after discharging any and all debts or obligations of the Corporation shall to the extent allowed by law enure to the benefit of the lot owners of the Corporation and for the perpetual care and upkeep of the cemetery or cemeteries owned by the Corporation and shall in no way enure to the benefit of any other person or individual. Petitioner's incorporators were Buchanan, Buchanan, Jr., Keller, and Henry D. Norris. Its first board of directors was composed of its incorporations and additionally Richard H. Dye. The original directors served continuously and constituted the entire board of directors until July 2, 1957, at which time three other individuals were elected as additional members of the board. The compensation received by each of the directors, as officers and directors, including an annual fee of $50 for serving on the board, during the fiscal years in issue is as follows: Fiscal Year
Fiscal Year
Fiscal Year
1957
1958
1959
Paul H. Buchanan, Sr.
$2,200.00
$2,450.00
$2,450.00
Paul H. Buchanan, Jr.
2,200.00
2,450.00
2,450.00
Donald B. Keller
2,200.00
2,450.00
2,450.00
Richard H. Dye
458.26
550.00
550.00
Henry D. Norris
50.00
50.00
*85 The three additional members of the board of directors who were elected to the board on July 2, 1957, each received $50 as directors' fees during each of the fiscal years ended in 1958 and 1959. Buchanan, as chairman of the board of directors, participated in the planning of the construction of a garden crypt mausoleum undertaken by petitioner, and in various other improvements made to the cemetery. Petitioner was able to obtain bank loans on his personal credit which it would not otherwise have been able to obtain. Buchanan, Jr., who served as petitioner's secretary-treasurer and one of its directors, attended all meetings of its board of directors, and prepared and had custody of the minutes of the board meetings. He also kept all of petitioner's records other than its financial records. Buchanan, Jr., also rendered legal services to petitioner for which he received compensation on an hourly basis at rates in accordance with those adopted by the Indianapolis Bar Association. Keller served petitioner as executive vice president and was petitioner's chief administrative officer, in which capacity he exercised day-to-day supervision over petitioner's activities and operations. Richard *86 H. Dye, although petitioner's president, has never performed services as petitioner's chief executive officer. However, as a Thirty-Third Degree Mason, a Past Master of his Masonic Lodge, and Past Officer of the Scottish Rite, as well as having been active in Murat Shrine over a period of approximately 35 years, he maintained important contacts for Washington Park Cemetery which was built around a Masonic theme and had many Masons buried in it. On June 18, 1956, the syndicate entered into an agreement with petitioner in which the syndicate agreed to sell to petitioner a part of the cemetery assets acquired from Indiana Corporation, and the use of the name Washington Park Cemetery or any variation thereof. It was agreed that the purchase price would be determined within a period of 15 months and on the basis of a valuation date of May 25, 1956, for the assets purchased and liabilities assumed. The value of the assets transferred to petitioner was to be determined in accordance with certain formulae and supported by appraisals of two independent disinterested persons experienced in the cemetery business. Petitioner agreed to pay the purchase price by issuing unsecured, nonnegotiable, *87 noninterest-bearing debenture notes having a maturity date of at least 35 years from the date of closing. It was agreed that no installment payments were required by the terms of the notes, but petitioner was required to provide for payment of the notes by setting aside at least 10 percent of the retail selling price of grave space, crypt space, niche space, monument or marker, or other item sold at retail to the public. The sales agreement was approved by petitioner's board of directors on the date it was entered into, June 18, 1956. The sales agreement was carried out on July 2, 1957, when members of the syndicate transferred by deed to petitioner approximately 55 acres of the land which they had originally acquired from Indiana Corporation. This conveyance specifically excepted a lake area in the central part of the cemetery known as section H and consisting of approximately 7.2 acres. The land on which the administration building and community mausoleum stood was conveyed to petitioner but the land surrounding these buildings was not conveyed to petitioner. Petitioner acquired rights of ingress and egress and the right to maintain those areas of land which were not conveyed *88 to it. The deed was recorded on August 28, 1958. The members of the syndicate also executed on July 2, 1957, a bill of sale which transferred to petitioner the operating assets of Washington Park Cemetery. Coincidental with the execution of the deed and bill of sale, petitioner issued its noninterest, nonnegotiable debenture notes in the face amount of $709,400, due 35 years after July 2, 1957, in the form provided in the sales agreement and in consideration for the assets received pursuant to the deed and bill of sale executed by the members of the syndicate. Each debenture contained, inter alia, the following provisions: * * *
The Maker hereof agrees, effective July 2, 1960, to set aside in a sinking fund for the purpose of paying such debenture notes, an amount equal to not less than ten (10%) percent of the retail selling price of each lot or grave space, crypt space, niche space, monument or marker, or other item sold at retail by it. Such ten (10%) percent shall be payable out of the payments made by the purchasers thereof as and when received by it. The term "retail selling price" shall not be deemed to include amounts set aside for endowment care funds. * * * *89 The Maker hereof agrees that in the event at any time any required deposit to the sinking fund or any payment under the terms hereof shall remain due and unpaid for a period of sixty (60) days after the same shall have become due, the legal holder hereof shall, upon sixty (60) days notice in writing to the Maker hereof, have the right to declare the entire balance of debentures issued, due and payable and proceed to collect same by legal remedy or process, without relief from valuation or appraisement laws, and with attorney's fees. The average receipts of Indiana Corporation from the sale of crypts and from the sale of niches during the years 1950 through 1954 were the respective amounts of $25,856.78 and $492.07. The average receipts of Indiana Corporation from the sale of cemetery lots, markers, containers, vases, and urns for the years 1953 and 1954 were in the amount of $108,509.17. The members of the syndicate could reasonably anticipate at the time they received the debenture notes that, effective July 2, 1960, $12,000 would be set aside in the sinking fund for the payment of such notes each year, and that an equivalent amount of such notes would be paid annually. They could *90 reasonably anticipate at that time that the balance of said notes (in the amount of $565,400) would be paid to them at the end of 15 years. The present value as of July 2, 1957, of the debenture notes received by the members of the syndicate was the approximate sum of $414,000 (using an interest factor of 4 percent). Petitioner's articles of incorporation provided that the members of the corporation consist of those persons serving as members of the board, which was to be a minimum of three and a maximum of nine, and the board by adoption of bylaws or resolutions may enlarge the membership or create additional classes of membership and define their relative rights, preferences, and restrictions and limitations, including voting rights. In petitioner's bylaws the board provided for two classes of membership: Active members consisting of those serving as members of the board, and associate members consisting of those persons holding debentures issued by petitioner. Each active member was given the right to cast one vote at meetings of the corporation and each associate member was given one vote for each $1,000 face value of debenture owned. Petitioner issued its 35-year debenture notes *91 on July 2, 1957, serially to the members of the syndicate so that note number 1 in the amount of $5,000 was issued to Buchanan, note number 2 in the amount of $2,000 was issued to Keller, and note number 3 in the amount of $2,000 was issued to Buchanan, Jr. The series, comprising 60 notes, was continued until notes in the total face amount of $100,000 were issued to Buchanan. Keller and Buchanan, Jr., each was issued notes in the total face amount of $41,500. Thereafter, petitioner's notes numbered 61 through 83 were issued to Buchanan so that the total face amount of petitioner's notes held by him was $212,820. Notes numbered 84 through 167 were issued alternatively to Keller and Buchanan, Jr., so that the total face amount of petitioner's notes issued to each was $248,290. In all, petitioner issued 167 notes totaling $709,400. The notes were payable in numerical order so that each of the members of the syndicate would recover his investment, then Buchanan would receive the profit from his investment, and finally Keller and Buchanan, Jr., would receive the profit from their investment. The debenture notes issued by petitioner were intended by the members of the syndicate to be evidence *92 of petitioner's indebtedness to them. The total face amount of the debenture notes was based upon a valuation of the assets transferred to petitioner. The petitioner's accountant, Owen S. Parrish, sometimes hereinafter referred to as Parrish, and general manager, Richard H. Maurice, sometimes hereinafter referred to as Maurice, participated in the valuation of the assets acquired by petitioner. Maurice has been in the cemetery business for approximately 32 years. He was responsible for the original purchase of many of the items transferred to petitioner and he was familiar with their price structure at the date of valuation. The values assigned to the operating assets and land as of May 25, 1956, which were transferred to petitioner, are as follows: Assets acquired: Petty cash
$ 95.00
Contracts receivable
115,996.74
Inventory - cemetery
supplies
1,357.40
Burial equipment
3,425.00
Crematory
15,600.00
Cemetery equipment
10,290.00
Office building
29,760.00
Office furniture and
equipment
1,861.00
Total Operating Assets
$178,385.14
Liabilities assumed
25,921.58
Net Operating Assets Acquired
$152,463.56
Land [1]
508,237.44
Community Mausoleum
48,699.00
Total
$709,400.00
*93 The net operating assets included contracts and accounts receivable valued at $115,996.74. This figure was $78,366.38 less than the value Indiana Corporation had placed on the accounts receivable when selling them to the syndicate. Petitioner's accountant derived the figure of $115,996.74 by sending out a series of letters to all of the debtors requesting that they confirm the amounts due. All of the accounts receivable were collected by petitioner except an amount of approximately $3,000 as of May 10, 1962. Payments were still being received by petitioner at the time of trial on approximately 25 contracts reflected in the amount of $3,000, and the outstanding amount of $3,000 may ultimately be collected by petitioner. Cemetery supplies, burial equipment, cemetery equipment, and office furniture and equipment, all of which were the usual and necessary operating assets of a cemetery, were physically inventoried by Parrish and Maurice and their staff, and their values were arrived at by reference to invoices covering the latest purchases of these items. The *94 values assigned to each of these items transferred to petitioner were reasonable. The value of the crematory, as of May 25, 1956, was determined to be $15,600 on the basis of a replacement cost of $17,000, plus $3,000 representing one-half of present cost of a smokestack which also served a heating unit, less depreciation in the amount of $4,400 based on a 50-year life and use of the crematory for 11 years beginning in 1945. The replacement cost was supplied by the manufacturer of the crematory transferred to petitioner. The value of the office building as of May 25, 1956, was determined to be $29,760, based on an appraisal by a state agent of the Aetna Casualty and Surety Co., fire division. The agent determined the approximate replacement cost of a new office building to be $39,680 and accrued depreciation to be $9,920, resulting in a depreciated value for the office building transferred to petitioner to be $29,760. The values assigned to the crematory and office building transferred to petitioner were reasonable. The liabilities assumed by petitioner as of May 25, 1956, which were determined to be $25,921.58, included accounts payable, employee deductions for withholding taxes *95 and F.I.C.A. tax, accrued taxes, accrued commissions, accrued payroll, prepaid income on inscriptions, urns and a special contract, and reserves representing 15 percent of contracts receivable on grave space and 10 percentof contracts receivable on mausoleum space. The liabilities were determined by petitioner's accountant who referred to Indiana Corporation's tax returns, checks, and payroll. The values assigned to the liabilities assumed by petitioner were reasonable. The land acquired by petitioner consisted of approximately 55 acres which was landscaped and developed as interment acreage and contained embellishments, roadways, and a drainage system. On this land approximately 41,430 grave spaces were sold and approximately 13,040 interments had taken place. Approximately 17,000 salable grave spaces remained on the land acquired by petitioner, which consisted of approximately 476,664 square feet including contract cancellations and eliminating land occupied by roadways. Each underground grave occtipied approximately 28.05 square feet. At the time of the sale to petitioner it was contemplated that garden crypts would be erected which would permit the interment of more bodies above *96 ground than could be interred within the same space than if underground burials alone were made in that space. The sales price for graves in Washington Park in 1956 was $91, or $3.25 per square foot. It was determined by the members of the syndicate that it would take 35 years to sell all the grave space available on the land transferred to petitioner, and that the sales price of graves would increase approximately 5 percent per year. Accordingly, it was determined that the average sales price per square foot over a period of 35 years of available grave space would be $6.09375, and that the gross sales of 476,664 square feet would be $2,904.671. This figure was reduced by 35 percent or $1,016,635 for selling costs, insurance, and other expenses, and by an additional 15 percent or $435,700 for contributions to a perpetual care fund as required by Indiana law. There was also deducted an amount of $66,929 for grave spaces which Indiana Corporation pledged in lieu of cash to the endowment care fund, leaving net proceeds in the amount of $1,385,407. From this figure there was then deducted an amount equal to the estimated amount of Federal corporate income taxes based on rates of tax on *97 average profits over the 35-year period and payable by a forprofit corporation. After all of these deductions were taken from the gross sales proceeds there remained a balance of which 40 percent was allocated to petitioner and 60 percent, or $508,210, was allocated to the purchase price. Thus, the corporate income tax which would have been payable by a taxable corporation was assigned to petitioner in addition to 40 percent of the projected profits after such taxes and other deductions listed above. No value was ascribed to the embellishments on the land sold. The valuation of the community mausoleum was arrived at in a somewhat similar manner. Petitioner's accountant and general manager inventoried all unsold mausoleum crypts and niche spaces, and arrived at a total selling price of $292,099 based upon selling prices in 1956. Selling costs, insurance, and other expenses equal to 35 percent of the gross sales, or $102,235, were deducted from the gross sales price. An additional 10 percent or $29,210 was allocated to a care fund for the mausoleum. Indiana law required that $50 of the sale proceeds from each crypt be set aside for the care fund. The gross sales figure was also reduced *98 by the total sum of $81,000 which was the amount estimated to finish the rooms and the niches in the mausoleum. There remained a net realizable value of $79,654. From this figure there was then deducted an amount equal to the estimated amount of Federal corporate income taxes based on rates of tax on average profits over a 35-year period and payable by a for-profit corporation. After all of these deductions were taken from the gross sales proceeds, there remained a balance of which 40 percent was allocated to petitioner and 60 percent, or $48,699, was allocated to the purchase price. No value was ascribed to the two chapels. The 13,000 interments that had taken place in Washington Park Cemtery by 1956 and the fact that Washington Park Cemetery was organized around a Masonic theme constituted a valuable heritage. The term heritage, as commonly used in the cemetery business, means an asset akin to good will accruing to a well-managed and well-maintained cemetery. It is based to a large extent on a wish of people to be buried near their relative and friends, which creates a demand for the sale of available space in a cemetery. Although heritage is not measurable in a specific dollar *99 amount, Washington Park's heritage was such that it significantly supported estimates that the value of the grave spaces would increase 5 percent per year. Petitioner could reasonably expect to sell out the remaining 17,000 grave spaces on the land transferred to it over a 15-year period, and it was reasonable to estimate that the selling price of grave space in Washington Park Cemetery would increase 5 percent per year over the 15-year sell-out period. The formula used to evaluate the land transferred to petitioner was in accordance with the usual practice for evaluating cemetery land, and the factors used in the application of the formula to the evaluation of the land transferred to petitioner were correct except in one important particular. Considering the fact that Indiana Corporation had sold a little over 1,000 lots a year during the last 5 years of its operation, it could be reasonably anticipated that the sell-out period would be 15 years instead of 35 years. The selling price of mausoleum and niche space increased at even a higher rate than the selling price of graves. To account for this increment we have not reduced the gross sales figure by $81,000 which was the amount *100 estimated to finish the rooms and the niches in the mausoleum. Using these changed factors and applying the same formula, the valuations of the cemetery land and mausoleum transferred to petitioner would be in the respective amounts of $336,966.37 and $46,268.35. These valuations are amounts based on the reasonably-to-be-anticipated revenue from sales of petitioner over a 15-year period. The present total value as of July 2, 1957, of those amounts was the approximate sum of $280,000 (using an interest factor of 4 percent). This latter amount was not an unrealistically excessive price for petitioner to pay for the cemetery land and mausoleum and represented a fair and reasonable valuation of those assets. The total amount of approximately $432,000 represented a fair and reasonable present valuation of all the assets conveyed by the members of the syndicate to petitioner as of July 2, 1957. The present value then as of that date of the debenture notes issued by petitioner to them in payment for such assets was the approximate amount of $414,000. Petitioner entered into an exclusive sales agreement on October 9, 1956, with Henry D. Norris & Associates, a partnership composed of Henry *101 D. Norris, sometimes hereinafter referred to as Norris, and his wife, whereby Norris agreed to render sales services as an independent contractor in connection with the preneed selling of petitioner's grave spaces, crypt spaces, and niche spaces. The effective date of the agreement was May 25, 1956, and it was to be effective for a period of 5 years from that date, during which period Norris agreed to produce a minimum gross volume of business in the amount of $350,000 per year. The agreement provided that Norris would bear all costs of selling and promotion of the sales program, and that Norris would be paid commissions at the rate of 32 percent of gross sales prices on graves, 32 percent of gross sales prices after deduction of care fund contributions on sales of crypts and niches, and 22 percent of the gross sales prices after deduction of care fund contributions on all sales completed by petitioner. The agreement was amended on August 23, 1957, to substitute a 35 percent commission in lieu of the 32 percent commission as originally agreed upon. Many cemeteries pay higher commissions to obtain services similar to those rendered by Norris, and in at least one instance Norris obtained *102 a higher commission to perform his services for another cemetery. The sales produced by Norris were substantially in excess of the minimum requirements of the contract, and the agreement, which was negotiated and carried out on an arm's-length basis between petitioner and Norris, was advantageous to petitioner. Petitioner entered into all the sales contracts for grave spaces, crypt spaces, and mausoleum spaces, which sales were generated by Norris. In the sales contracts petitioner agreed to issue to the purchasers certificates of ownership of burial rights. It was provided that the purchase price included contributions to the endowment care fund for grave spaces in accordance with a trust administered for that purpose under the direction of the Circuit Court of Marion County, Indiana, and a contribution to an endowment care fund in the amount of at least $50 for each crypt sold. A cemetery may be characterized as a wasting asset in view of the fact that once a grave space is sold it is off the market forever, and ultimately all available grave, crypt, and niche spaces will be sold. Proceeds from the sale of burial spaces and services are used in part to maintain and care for the *103 cemetery. To provide for perpetual care and maintenance of a cemetery the State of Indiana, as do most states, requires that cemetery associations set aside in a trust, sometimes referred to as an endowment care fund, certain percentages of the proceeds from sales of grave spaces and crypts. The income of the endowment care fund is used for all the ordinary maintenance costs of a cemetery, including care of grass, trees and shrubs, water systems, roads, fences, and buildings. During the formative years of a cemetery the endowment care fund is not large enough to produce sufficient income to meet the maintenance costs of a cemetery. Therefore, a substantial portion of the maintenance costs must necessarily be paid out of the proceeds of the sales of grave, crypt, and niche spaces, and the service income earned by the cemetery. After a cemetery is completely sold out, the trustee of the endowment care fund collects the income and uses it to maintain the property. The sufficiency of such income to meet the prevailing costs of maintenance will determine whether the cemetery will remain well kept *104 or decline into a condition of neglect and decay. It has been the experience among for-profit and not-for-profit cemeteries that the endowment care funds are not adequate to meet maintenance costs until the cemetery properties are nearly sold out, even if then. Petitioner also earned service income, the sources of which are charges for the sale of flowers, markers, monuments, and urns, and the rendering of services such as opening and closing graves. Over a period of time, as interments take place, service income increases and is eventually more profitable to a cemetery than income from its land sales. Service income is used to defray maintenance expenses, and petitioner could reasonably anticipate that over the sell-out period the net income from services would approximately balance the cost of maintenance. In determining the purchase price of the assets acquired by petitioner, neither service income nor maintenance expenses were taken into account. Also, income from the endowment care fund, which is properly chargeable with costs of maintenance, was not taken into account in determining the purchase price of the assets acquired by petitioner. As of May 25, 1956, Indiana Corporation *105 had set aside in an endowment care fund $105,597.11, of which $78,476.28 was attributed to mausoleum crypts and $27,120.83 was attributed to cemetery lots and graves. During the taxable years involved herein and the 2 succeeding years the amounts of and increases in petitioner's endowment care fund were as follows: Total of
Increase over
Period or
Endowment
Preceding
Year Ended
Care Fund
Period
April 30, 1957
$106,197.11
$ 600.00
April 30, 1958
129,869.62
23,672.51
April 30, 1959
296,912.50
167,042.88
April 30, 1960
372,377.14
75,464.64
April 30, 1961
440,423.06
68,045.92 The above total amounts in the endowment care fund included contributions attributable to mausoleum crypts which exceeded the $50 per crypt minimum required to be contributed by Indiana law during the fiscal years ended April 30, 1957, through April 30, 1959, by the respective amounts of $2,456.50, $520,and $3,398. During the taxable years here in issue petitioner expended a total of $592,706.21 on cemetery improvements as follows: Land improvement costs
$ 4,221.81
Equipment purchases
17,383.88
Community mausoleum development
9,801.03
Construction of garden crypts
517,172.78
Construction started on additional
wing of community mausoleum
44,126.71
Total
$592,706.21
*106 In addition, petitioner caused the construction of hard-surfaced roads, cleaning and draining of the lake on section H, and funds were expended for maintenance and landscaping throughout the cemetery. The lake area which was retained by Keller and Buchanan, Jr., was unfit for burial use owing to a high water table. Petitioner, however, maintained the area and paid no rental for use of the area. Construction of garden crypts took place on this area prior to September 3, 1959, the date on which Keller and Buchanan, Jr., conveyed this area by warranty deed to petitioner. The deed was recorded on March 1, 1961. Petitioner paid no consideration for this conveyance, and it was the intention of Keller and Buchanan, Jr., to convey this section H to petitioner without additional consideration whenever it became of value to petitioner. The construction of the garden mausoleum was done by Foster Engineering Company which was headed by C. Wilbur Foster, one of petitioner's directors who took office on or about July 2, 1957. The construction of the additional wing on the community mausoleum commenced during the taxable years in issue was on land which has never been conveyed to petitioner. *107 However, petitioner was never charged any rent for use of the land and it had by the terms of the deed it received from the syndicate on July 2, 1957, full rights of ingress and egress to the community mausoleum, as well as the administration building which was also located on the same parcel of land not conveyed to petitioner. The undeveloped land acquired by the syndicate from Indiana Corporation and not transferred to petitioner was zoned for cemetery use and was the only practical area available for expansion of Washington Park Cemetery. Subsequent to the years in issue Buchanan, Jr., and Keller granted petitioner an easement to build a road over the undeveloped land retained by them so that petitioner would have ingress and egress to its north. Petitioner gave no consideration for this easement. Before the undeveloped land would be suitable for burial use it would have to be filled. Washington Park dumps its excess dirt on this land, but is paid nothing for it. Land adjacent to Washington Park Cemetery, which came up for sale sometime subsequent to the years in issue, was acquired by Buchanan, Jr., and Keller. The members of the syndicate loaned petitioner $20,000 when it *108 began operations on May 25, 1956, in order to supply petitioner with working capital. Petitioner issued a promissory note evidencing the loan, bearing no interest and payable in 90 days. On July 25, 1956, petitioner repaid the loan in full, without interest. It is difficult for a cemetery to obtain bank loans. By resolution of petitioner's board of directors at its annual meeting on July 19, 1958, redemption was authorized of debenture note certificates numbers 1 through 15 in the total sum of $45,000. Pursuant to the resolution, petitioner issued its check dated December 16, 1958, to Buchanan in the amount of $25,000, and checks dated December 4, 1958, to Keller and Buchanan, Jr., each in the amount of $10,000. Such redemption was made possible by reason of the unexpected financial success of petitioner during the first few years under its new and aggressive management. The members of the syndicate have been prominent and favorably known in the cemetery and mortuary business in and around the Indianapolis area. Flanner and Buchanan, Inc., is one of the largest mortuaries in Indiana and has been in business in and around Indianapolis since 1887. Buchanan has been associated with *109 it all of his adult life. Buchanan, Jr., serves as its legal counsel and is one of its small stockholders. Dye is its treasurer and has also been active in its operation by conducting its funeral services and assisting in the general management of the firm. He owned no stock in the corporation but received salaries of $18,850, $19,300, and $19,300 during the years 1957, 1958, and 1959, respectively. Flanner and Buchanan, Inc., has a main establishment in the central part of Indianapolis in which it operates a crematory, and two branch establishments. Also, Buchanan, Buchanan, Jr., Keller, and another are partners in a partnership operating a funeral home. Floral Park Cemetery Association, Inc., is a membership not-for-profit corporation incorporated under the laws of Indiana which operates a cemetery in Indianapolis known as Floral Park West. Its officers include, among others, Buchanan and Buchanan, Jr. Norris had a sales contract with Floral Park Cemetery Association, Inc., which was similar to his contract with Washington Park Cemetery. In 1958 Buchanan, Jr., acquired stock in a for-profit corporation, Resthaven Memorial Lawns Cemetery, which operated a cemetery in Indianapolis *110 known as Rest Haven. The officers of the corporation included Buchanan, Buchanan, Jr., Norris, and Keller, and they caused the name of the cemetery to be changed to Washington Park North, and thereafter referred to petitioner as Washington Park Cemetery East. In advertisements to the public it was represented that Washington Park Cemetery North was associated with Washington Park Cemetery East and Floral Park Cemetery West. Petitioner received no consideration from Resthaven Memorial Lawns Cemetery for use of its name. Crown Hill Cemetery, which is not associated with petitioner or any of the members of the syndicate, is located in Indianapolis and is one of the largest cemeteries in the United States. It was formed in 1863. Many prominent citizens are buried there, and as a result it possesses a valuable heritage. Because of its large heritage in the Indianapolis area Crown Hill found it unnecessary to conduct preneed sales campaigns. Beginning in 1946 the cost of grave spaces in Crown Hill Cemetery has increased at the rate of approximately 8 percent per year. Another cemetery in Marion County known as New Crown Cemetery had no connection with Crown Hill Cemetery, and it did not *111 divert profits from Crown Hill Cemetery by reason of sharing a similar name. Crown Hill Cemetery realized as profit approximately 25 percent of its gross revenues from sales. The members of the syndicate reported adjusted gross income on their joint Federal income tax returns for the years and in the amounts as follows: Adjusted
Syndicate Member
Year
Gross Income
Paul H. Buchanan, Sr.
1956
$ 97,729.97
1957
111,639.59
1959
121,619.90
Paul H. Buchanan, Jr.
1956
27,384.02
1957
26,526.33
1958
26,834.76
1959
33,052.68
Donald B. Keller
1956
52,914.63
1957
66,813.46
1958
76,851.22
1959
88,105.62
On December 16, 1957, petitioner timely filed, pursuant to extensions granted, an exemption application, Form 1026, with the district director of internal revenue at Indianapolis, Indiana, seeking exemption from Federal corporate income taxes under the provisions of section 501(c)(13) of the Internal Revenue Code of 1954. Petitioner also filed with the district director at Indianapolis, Indiana, an information return, Form 990, for each of the taxable years involved herein. These were filed in lieu of the *112 usual corporate tax returns on Forms 1120 on advice of petitioner's counsel, with which advice petitioner's accountant agreed. Petitioner received a letter dated January 14, 1959, from respondent requesting additional information with regard to its application for exemption from Federal income tax, to which petitioner responded by letter dated February 19, 1959. By letter dated July 17, 1959, respondent informed petitioner that it did not qualify for exemption from taxation as a nonprofit cemetery because petitioner was operated for the benefit of its individual incorporators, and accordingly it was required to file income tax returns on Forms 1120. By letter dated September 22, 1959, petitioner protested the ruling. Respondent rejected the protest and affirmed its ruling of July 17, 1959, by letter to petitioner dated December 18, 1959, from the director of the tax rulings division. Opinion KERN, Judge: The principal issue for our decision is whether petitioner is entitled to be exempt from taxation pursuant to section 501(a) and (c)( 13) of the Internal Revenue Code of 1954. Respondent contends that petitioner has failed to meet the statutory requirements *113 for exempt status largely because the price petitioner paid for the assets it acquired from the members of the syndicate was excessive and resulted in a portion of petitioner's net earnings inuring to the benefit of these individuals, and for the additional reason that the members of the syndicate who were in control of petitioner have caused it to enter into transactions which have resulted in a portion of petitioner's net earnings inuring to their benefit. It is contended on behalf of petitioner that it qualified in all respects as a cemetery corporation exempt from Federal income tax under section 501 of the Internal Revenue Code of 1954. It is specifically argued that the price petitioner paid for its land and operating assets was reasonable and was arrived at in accordance with the customary method of evaluating cemetery properties, and that the individuals who were in control of petitioner operated it for the benefit of its burial-space owners and the community, and not for the benefit of those individuals in control of petitioner. Section 501(c)(13) of the Internal Revenue Code *114 of 1954 provides that the following organizations shall be exempt from taxation under section 501(a) of the Internal Revenue Code of 1954: "Cemetery companies owned and operated exclusively for the benefit of their members or which are not operated for profit; and any corporation chartered solely for burial purposes as a cemetery corporation and not permitted by its charter to engage in any business not necessarily incident to that purpose, no part of the net earnings of which inures to the benefit of any private shareholder or individual." The statute referred to above confers exempt status upon cemetery companies which are (1) "owned and operated exclusively for the benefit of their members;" (2) "not operated for profit;" or (3) "chartered solely for burial purposes as a cemetery corporation and not permitted by its charter to engage in any business not necessarily incident to that purpose, no part of the net earnings of which inures to the benefit of any private shareholder or individual." It has been held that the foregoing requisites are mutually independent *115 and that a cemetery company which fulfills any one of the three requirements is entitled to exemption. West Laurel Hill Cemetery Co. v. Rothensies, 139 F. 2d 50, certiorari denied 321 U.S. 780; Commissioner v. Kensico Cemetery, 96 F. 2d 594, affirming 35 B.T.A. 498. It is so recognized in the Commissioner's Income Tax Regs. [2]A provision granting an exemption, such as this, must be strictly construed and it is petitioner's burden to show that it fulfills the requirements of the statute. Journal of Accountancy, Inc. [Dec. 5312], 16 B.T.A. 1260, 1266. *116 It is apparent that petitioner does not come within the requisites of the first classification of the statute as a cemetery company owned and operated exclusively for the benefit of its members. It has been held that this provision was intended to apply to those companies wherein purchasers of lots or rights of burial in a cemetery become entitled to membership in the company and have a voice in its management or operation. Forest Lawn Memorial Park Association, Inc., 45 B.T.A. 1091; West Laurel Hill Cemetery Co. v. Rothensies, supra.Pursuant to its articles of incorporation and bylaws, petitioner's members consisted of those serving on its board of directors and those persons holding debentures issued by petitioner. At meetings of petitioner each director was entitled to one vote and the holders of the debenture notes were entitled to one vote for each $1,000 note. All voting powers in and management of petitioner were retained by its organizers and not by those entitled to sepulchral rights in Washington Park Cemetery. Petitioner's arguments that purchasers *117 of grave and crypt spaces would not qualify for nor would welcome participation in management, and that it was necessary to retain management and control of the cemetery in its organizers who were qualified and experienced to perform the specialized services incident to running a cemetery are irrelevant. Petitioner was not owned by and operated exclusively for the benefit of its "members." Petitioner was organized and has been operating as a cemetery business, and it conducted only activities necessary and incidental to the operation of a cemetery. Petitioner's articles of incorporation provided that upon liquidation and dissolution any property and monies remaining after discharging debts of the corporation shall inure to the benefit of lot owners of the cemetery and for the perpetual care and upkeep of the cemetery, and shall in no way inure to the benefit of any other person or individual. The fact that petitioner corporation itself derived gains from services it performed, such as sale of flowers, urns, engraving, and watering, does not indicate that petitioner was operated for profit, and it is not so argued by respondent. See Trinidad v. Sagrada Orden, 263 U.S. 578; *118 Forest Lawn Memorial Park Association, Inc., supra.It may also be noted that respondent does not argue that the compensation and directors' fees paid to petitioner's directors were unreasonable. The main preoccupation of the parties in this case has been to establish whether or not petitioner's net earnings inure "to the benefit of any private shareholder or individual." Respondent contends that we need look no further than the first transaction engaged in by petitioner in which petitioner acquired its assets to find that petitioner is not entitled to tax exempt status. On brief, both parties seem to be in agreement that if the purchase price petitioner paid to its organizers was unrealistically excessive then a portion of its net earnings might be considered as indirectly inuring to the benefit of its organizers. See Texas Trade School, 30 T.C. 642 affd. 272 F. 2d 168; Mabee Petroleum Corp. v. United States, 203 F. 2d 872. Buchanan, Buchanan, Jr., and Keller organized petitioner and then entered into a sales agreement with it to transfer to it approximately 55 acres of land and the operating assets of Washington Park Cemetery. *119 The agreement required that the ultimate purchase price be determined upon the basis of an evaluation as of May 25, 1956, of the assets transferred to petitioner. The agreement provided that the entire purchase price was to be paid by petitioner by the issuance of noninterest-bearing, unsecured, and nonnegotiable debenture notes. These notes were to mature in 35 years, and the holders were to have no right to any payment on account of the notes until the maturity date. The ultimate price agreed upon and reflected in the total face value of the 35-year debenture notes issued was $709,400. It is argued on behalf of petitioner that petitioner paid a fair price for the assets it received and that the syndicate did not receive the equivalent of $709,400 from the transfer of the assets as this amount should be discounted to reflect the fact that there was no immediate right to payment. Respondent argues that petitioner paid such an excessive "price" for its assets as to require a conclusion that a large part of such "price" was not in reality the purchase price of the assets petitioner acquired but to a large extent was in reality a payment to the vendors of petitioner's anticipated *120 net earnings, so that we must reach the ultimate conclusion that a part of petitioner's net earnings inured to the benefit of the members of the syndicate. Respondent relies heavily on the facts that the members of the syndicate acquired all of the assets of Indiana Corporation for a cash outlay of approximately $179,748.73, and that a part of these assets was transferred to petitioner for debenture notes in the face amount of $709,400. We first note that the statutory proscription against allowance of tax exempt status turns on whether or not petitioner's net earnings inure to the benefit of any private individual or shareholder. The fact that part of the profits earned by petitioner is devoted to payment of the purchase price of the assets it acquired from the members of the syndicate does not establish that the profits of the cemetery corporation inure to the benefit of these individuals so as to destroy any right to exemption which might otherwise apply. Principal and interest due on indebtedness incurred to acquire property are properly charges against gross income in arriving at net *121 earnings. See Commissioner v. Kensico Cemetery, supra; A. Shiffman, 32 T.C. 1073; Estate of Ernest G. Howes, 30 T.C. 909, affirmed sub nom. Commissioner v. Johnson, 267 F. 2d 382; Ohio Furnace Co., 25 T.C. 179; Knapp Brothers Shoe Mfg. Corp. v. United States, 142 F. Supp. 899 (Ct. Cls.). As a corollary if the payment of a reasonable purchase price by petitioner for its assets should also result in a gain to the sellers of the property, it does not follow that a part of petitioner's net earnings has inured to the benefit of private individuals. Commissioner v. Kensico Cemetery, supra at 596. In our opinion the members of the syndicate made a bona fide attempt to arrive at a fair and reasonable price for the assets transferred to petitioner. The land and mausoleum which were transferred to petitioner were valued in accordance with the customary method of evaluating cemetery properties, i.e., in terms of the net proceeds which could be anticipated from the sale of graves. We have found that the factors used in the application of the formula for evaluating the land and mausoleum transferred *122 to petitioner were correct, except with the important modification that it could reasonably be anticipated that the sell-out period would be 15 years instead of 35 years. We have found, by applying the formula used by petitioner to evaluate cemetery properties and using a sell-out period of 15 years, that the reasonably-to-be-anticipated net earnings as of July 2, 1957, of the cemetery land and mausoleum transferred to petitioner were in the respective amounts of $561,610.62 and $77,113.92, of which 60 percent, or $336,966.37 and $46,268.35, respectively, are the values allocable to the purchase price. We have further discounted these latter amounts by determining the present value as of July 2, 1957, of the anticipated net earnings for each year during the sell-out period, taking into account an increment of 5 percent per year in the price of graves, and charges against gross sales revenues for selling expenses in the amount of 35 percent, contributions to the endowment care fund in the amount of 15 percent, a deduction of $66,929 for graves pledged to the endowment care fund, and Federal taxes payable by a for-profit corporation. The present value of 60 percent of the reasonably-to-be-anticipated *123 net earnings as of July 2, 1957, of the cemetery land and mausoleum, calculated under the abovedescribed formula as modified, was in the approximate total amount of $280,000. We conclude that this amount was not an unrealistically excessive price to be paid by petitioner for the cemetery land and mausoleum which it acquired from its organizers. We are also satisfied that the values determined in the total net amount of $152,463.56 for the various operating assets (and liabilities) were reasonable. The value assigned to the contracts receivable was reasonably accurate inasmuch as only $3,000 of a total amount of $115,996.74 remained uncollected at the time of trial, and that payments were still being made on the balance. All of the cemetery supplies, burial equipment, and office furniture and equipment were physically inventoried by petitioner's accountant and general manager. Petitioner's general manager worked in all phases of the cemetery business for about 32 years. He was responsible for the purchase of many of the items inventoried and he was familiar with the cost of these items at the date of valuation. All of the pertinent evidence indicates that reasonable values were assigned *124 to these items. The evidence relating to the valuation of the office building and crematory, which is reviewed in detail in our Findings, similarly indicates that the values assigned to these edifices were reasonable. Consequently, we have concluded that a fair and reasonable present value as of July 2, 1957, of all the assets transferred by the members of the syndicate to petitioner was in the total amount of approximately $432,000, which amount was not an unrealistically excessive price for petitioner to pay for the assets it acquired from its organizers. We have also concluded that the present value as of July 2, 1957, of the debenture notes issued by petitioner to the members of the syndicate in payment of such assets was the approximate amount of $414,000. It follows that petitioner did not pay an unrealistically excessive price for the assets it acquired and that no part of its net earnings inured to the benefit of any private shareholder or individual. In considering that a fair and reasonable present value as of July 2, 1957, of all the assets transferred to petitioner was in the approximate amount of $432,000, we have discounted the anticipated earnings from land and mausoleum *125 sales over a period of 15 years. In finding the present values of revenue from sales to be earned over the 15-year period from land and mausoleum sales and in finding the present value of the debenture notes, we allowed for a reasonable interest rate of 4 percent. Such discounts were necessary to compute the present values of the debenture notes issued by petitioner and also to ascertain the present value of earnings from land and mausoleum sales. The payment of a reasonable rate of interest on indebtedness by an otherwise exempt organization does not constitute the inurement of net earnings of the organization to the creditors. See Commissioner v. Kensico Cemetery, supra; Ohio Furnace Co., supra; Estate of Ernest G. Howes, supra. Respondent argues that the method used for computing the purchase price is erroneous because petitioner did not, in computing the net profit to be realized from anticipated grave sales, adequately allow for maintenance expenses. Respondent points out that in petitioner's computation the net realizable profit before taxes, but after all other deductions discussed above, was $1,385,407. This figure is approximately *126 40 percent of the estimated revenue from land sales ($2,904,671). In our computation, based on a sell-out period of 15 years, the anticipated profits before taxes are also approximately 40 percent of the estimated revenue from land sales. It is respondent's position that service income would not be sufficient to meet maintenance expenses, and that petitioner's estimated profit before taxes must therefore be reduced. Respondent also points out that a profit of 40 percent is unrealistic in view of Crown Hill Cemetery's experience that it realized approximately 25 percent profit on its gross sales, and Indiana Corporation realized approximate profits on its lot sales before income taxes of only 34 percent in 1950, 6 percent in 1952, 10 percent in 1953, 16 percent in 1955, and it suffered a loss in 1954. The record does not support respondent's analysis. Petitioner received service income and income from the endowment care fund which were not taken into account in computing the purchase price. The record establishes that petitioner could reasonably expect that service income plus the income from the endowment fund would equal maintenance expenses over the sellout period. In addition, *127 the net proceeds' from sales after taxes were not entirely allocated to the purchase price. Forty percent of this figure was allocated to the cemetery and only the remaining 60 percent constituted the purchase price. Therefore, an additional source of funds was available for maintenance expenses. Thus respondent's argument that petitioner paid an unrealistically excessive or inflated price for the assets it acquired because the maintenance costs were not taken into account is without merit in view of the fact that service and endowment care income were not taken into account in evaluating the assets acquired by petitioner. The fact that both Crown Hill Cemetery and Indiana Corporation realized a smaller profit than 40 percent on their gross land sales is not significant, as respondent contends. Crown Hill Cemetery had no preneed sales program and Indiana Corporation lacked capable management during its final years of operation because of the failing health of its chief executive officer. Respondent argues that the payment of $45,000 in 1958 by petitioner in retirement of some of the debenture notes constituted an inurement of petitioner's earnings to the members of the syndicate. *128 The record shows, however, that during the years in issue petitioner's sales program was successful beyond the anticipation of all concerned, it contributed funds in accordance with Indiana law to the endowment care fund, and it was well maintained so that it was considered to be one of the finest cemeteries in the community. Further, we have found that the members of the syndicate could reasonably anticipate that they would receive annually the contributions to the sinking fund in the amount of 10 percent of petitioner's sales (after contributions to the endowment care fund). Therefore, we do not find it unreasonable under the anticipated development for petitioner to have reduced its indebtedness when it had the ability to do so. The record also shows that petitioner undertook a program to improve the cemetery, including the construction of garden mausoleum crypts and a new wing to the community mausoleum. In all, petitioner expended a total sum of $592,706.21 during the taxable years in issue on improvements and maintenance of the cemetery. For purposes of completeness we note that the present value of the reasonably-to-be-anticipated earnings from the assets acquired by petitioner *129 does not include income from the endowment care fund. Also, the chapels and embellishments on the cemetery grounds, which were of substantial value, were not taken into account in determining the value of the assets transferred to petitioner. Petitioner had full rights of ingress and egress to the lake area known as section H and the entranceway to the cemetery which was owned by the syndicate. In 1959 section H was transferred to petitioner without consideration. An easement was also granted petitioner without consideration on the undeveloped land owned by the syndicate so that petitioner may have an additional entranceway to its north. The sales contract petitioner had with Norris was a distinct advantage to petitioner in that the commissions it paid were less than other cemeteries customarily paid for comparable services, and petitioner paid no more than reasonable compensation to its officers and directors. Viewing the record on the whole, we cannot find that the members of the syndicate diverted the net earnings of petitioner to their own benefit. The record does not show that the use of a variant of the name Washington Park Cemetery for another cemetery in Marion County diverted *130 profits from petitioner. The instant case is similar to Commissioner v. Kensico Cemtery, supra. In that case a cemetery corporation organized as a not-for-profit corporation under New York laws acquired its land by issuing land-share certificates and agreeing to pay to the holders of such certificates one-half of the amount realized from the sale of grave spaces. The respondent argued that the petitioner was organized and operated for the benefit of the land-share certificate holders. It was held, pursuant to a statute similar to section 501(c)(13), that the petitioner was exempt from tax for the reason that the land-share certificates represented a debt due from the petitioner to the holders. As such, no part of the earnings of the petitioner paid on the debt can be considered as net earnings inuring to the benefit of any private shareholder or individual. The facts of the instant case are more favorable to the petitioner than those appearing in Commissioner v. Kensico Cemetery, supra.In the instant case the purchase price was a fixed amount, as opposed to an indefinite purchase price consisting of one-half of the proceeds of sales in Kensico, the debenture *131 notes petitioner issued represented a debt due from the petitioner to the holders, and payment of that debt is not payment out of net earnings within the meaning of the statute. The case of Texas Trade School, supra, upon which respondent relies, is distinguishable. In that case it was held that individuals shared in the petitioner's net earnings as the result of the payment to them of excessive and unreasonable rent for real estate leased to or used by petitioner, and as the result of the construction by petitioner of buildings and improvements which attached to and became a part of their real estate. In the instant case petitioner did not pay an unreasonable and excessive price for the assets it acquired from the members of the syndicate. Although petitioner began construction of garden mausoleums on section H when that parcel of land belonged to Buchanan, Jr., and Keller, that land was eventually conveyed to petitioner for no additional consideration. Petitioner also owned the community mausoleum and the land thereunder, to which it added a wing on land not owned by it. Petitioner has had full rights of ingress and egress to the community mausoleum, and it paid no *132 additional consideration for use of the land on which the wing was constructed. It has retained all proceeds from the sale of space in the mausoleum, and there is no indication in the record that the ability of petitioner to expand was other than beneficial to it. Although Buchanan, Jr., and Keller retained legal title to this land on which the addition was built, there has been no inurement of petitioner's net earnings to their benefit. Further, as the organizers, directors, managers, and creditors of petitioner, it is not practical for them to take actions adverse to petitioner's interest. This is borne out by the facts that they loaned petitioner $20,000 without charging any interest when petitioner was first organized, they conveyed section H to petitioner without consideration, and they granted petitioner an easement without consideration on their land so that petitioner may have an additional entranceway. Petitioner was chartered and operated solely for burial purposes as a cemetery corporation and it did not engage in nor was it permitted by its charter to engage in any business not necessarily incident to that purpose. No part of its net earnings inured to the benefit of *133 any private shareholder or individual, and therefore it is exempt from taxation. In view of our holding that petitioner is exempt from taxation, it is unnecessary to consider the other issues raised in the pleadings. Decision will be entered for the petitioner. Footnotes
1. Ind. Ann. Stat. secs. 25-507 - 25-553 (1960).↩
1. Not available. ↩
2. Rounded off to nearest percent.↩
1. In order to issue the debentures in even hundreds of dollars an amount of $27.44 was added to the land valuation.↩
2. Sec. 1.501(c)(13)-1. Cemetery companies. (a) A cemetery company may be entitled to exemption - (1) If it is owned by and operated exclusively for the benefit of its lot owners who hold such lots for bona fide burial purposes and not for purpose of resale, or (2) If it is not operated for profit. (b) Any cemetery corporation chartered solely for burial purposes and not permitted by its charter to engage in any business not necessarily incident to that purpose is exempt from income tax, provided that no part of its net earnings inures to the benefit of any private shareholder or individual. * * *↩