**WEST LAUREL HILL CEMETERY CO. v. ROTHENSIES, Collector of Internal Revenue.**

**Nos. 8111–8113.**

Circuit Court of Appeals, Third Circuit.

Argued Dec. 23, 1942.

Decided Nov. 19, 1943.

Writs of Certiorari Denied March 6, 1944.

See 64 S.Ct. 636.

See, also, 44 F.Supp. 63.

Paul Reilly, of Philadelphia, Pa., for appellant.

Fred J. Neuland, of Washington, D. C. (Samuel O. Clark, Jr., Asst. Atty. Gen., Sewall Key and Helen R. Carloss, Sp. Assts. to Atty. Gen., and Gerald A. Gleeson, U. S. Atty., and Thomas J. Curtin, Asst. U. S. Atty., both of Philadelphia, Pa., on the brief), for appellee.

Before BIGGS, MARIS, and JONES, Circuit Judges.

JONES, Circuit Judge.

The question here involved is whether the plaintiff taxpayer is entitled to claim exemption, as a cemetery company, from liability for capital stock taxes for the years 1933, 1934 and 1935. The taxpayer, after disallowance of its claims for refund, filed three separate suits in the District Court against the collector to recover

the disputed taxes which it had been compelled to pay for each of the respective years mentioned. The cases were consolidated for trial and came before the court below on motions by the respective parties for summary judgments on the pleadings supported by a stipulation of facts. From the judgments entered by the trial court in favor of the defendant collector, the plaintiff took the pending appeals.

The statutes pertinent to the plaintiff's claims are Section 215 (c) (1) of the National Industrial Recovery Act of 1933, c. 90, 48 Stat. 195, 207, Section 103 (5) of the Revenue Act of 1932, c. 209, 47 Stat. 169, 26 U.S.C.A. Int.Rev.Acts, page 506, and the cognate provisions, Sec. 701 (c) (1) and Sec. 101 (5), of the Revenue Act of 1934, c. 277, 48 Stat. 680, 26 U.S.C.A. Int.Rev.Acts, page 787 and page 688.

Sec. 215 of the National Industrial Recovery Act, which imposed a capital stock tax on domestic corporations for each year ending June 30, provided in subsection (c) (1) thereof that,—

"(c) The taxes imposed by this section shall not apply—

"(1) to any corporation enumerated in section 103 of the Revenue Act of 1932;"

Sec. 103 of the Revenue Act of 1932 granted exemption to certain organizations from the income tax liability imposed by that Act upon corporations, among such exempted organizations being, "(5) Cemetery companies owned and operated exclusively for the benefit of their members or which are not operated for profit; and any corporation chartered solely for burial purposes as a cemetery corporation and not permitted by its charter to engage in any business not necessarily incident to that purpose, no part of the net earnings of which inures to the benefit of any private shareholder or individual."

By Sec. 701 (a) of the Revenue Act of 1934 a capital stock tax at the same rate as had been imposed by Sec. 215 (a) of the National Industrial Recovery Act was imposed on domestic corporations for each year ending June 30, beginning with the year ending June 30, 1934, and Sec. 701 (c) (1) of the Act of 1934 provided that,—

"(c) The taxes imposed by this section shall not apply—

"(1) to any corporation enumerated in section 101."

Among the corporations enumerated in Sec. 101 of the Revenue Act of 1934 (see subsection (5) were cemetery companies supplying qualifications similar to those specified in Sec. 103 (5) of the Revenue Act of 1932 as above quoted.

The question which we have for consideration is whether the court below erred in concluding that the instant taxpayer did not qualify during the years in question as a cemetery company within the intent of Sec. 103(5) of the Revenue Act of 1932 or the similar provision in Sec. 101(5) of the Revenue Act of 1934. As the two provisions are exactly alike, what we have to say with reference to the one is equally applicable to the other.

The plaintiff company was incorporated on November 9, 1869, under the laws of Pennsylvania. On October 20, 1869, John J. Smith, acting as the representative of a group who proposed to form the taxpayer corporation, acquired in his own name for the sum of $53,032.50 a tract of land of 88.5 acres which it was agreed would be conveyed to the taxpayer company. On November 16, 1869, Smith and his wife executed, acknowledged and delivered to the company a deed of the land in fee. Attached to the deed is a writing showing receipt of $53,-032.50 by Smith and his wife in full of the consideration for the conveyance. The money paid to acquire the land had been advanced by the group of proposed incorporators for which they were to receive credit on their respective subscriptions to the company's capital stock when the land was conveyed to it. On the "day book" opened by the company there appears the following entry: "Land Account dr. to John Jay Smith for 88-3875/10000 Acres purchased of him at $600 per acre—$53,-032.50." It also appears from entries in the company's books that the sum shown as due Smith for the land was applied against his purchase of $75,000 par value of company's stock. All told, the company's capital stock consisted of 3000 shares $50 par, all of which appear to have been subscribed for and for which stock certificates were issued. However, only $112,500 was actually paid in on account of the stock subscriptions. Additional lands were purchased by the company up to 1926, at which time it had a total of 150.9 acres.

At a special meeting of the board of managers of the company on November 21, 1881, one of the managers submitted, and the board approved, "the following report as a Declaration of the Trusts under which

the Cemetery Company holds its lands:—" etc.[1] The so-called declaration of trust acknowledged, inter alia, that the company held the lands whereof it was seized in trust (1) "for the purpose of a Cemetery or place of interment or burial, under and subject to the provisions of the Charter and By-Laws, [etc.] * * *" of the company; (2) for the purpose of conveying at fixed prices to purchasers rights of interment and to the exclusive use, possession and enjoyment of lots purchased, the company to set apart and invest "ten per centum of all purchase monies [so] received as and for a permanent fund, the principal of which shall not be diminished, the annual interest and income of which shall be applied for the preservation forever of the Cemetery premises aforesaid in good order and repair"; and (3) "to apply and appropriate out of the remainder of said purchase monies * * * received from said sales, and from any other uses of said Cemetery premises, * * *" (a) "to the current repair and proper care and improvement of said premises, and * * * to set apart a portion thereof [i. e. the residue of income from sales] not exceeding ten per cent for the formation of a contingent fund for the purchase of additional land or other useful or necessary purposes incident to said Cemetery, * * *" and (b) "to apply, appropriate and divide the annual net income and monies from time to time received from said sales, not required for the aforesaid purposes, to and among the contributors * * * in proportion to their respective interests and shares * * * for which they shall hold certificates to be issued by the said Company", the whole thereof consisting of 3000 equal parts or shares transferable only upon the books of the company, the net income so distributable by the company to be "the consideration for the conveyance of the said premises to the said Company for the aforesaid purposes."

The trust declaration further provided that the persons name as corporators in the charter of the company should be deemed stockholders in the company and entitled to one vote each and that the holders of the certificates under the trust declaration should "have all the rights and privileges of Stockholders in the said Company with a vote for each share represented by the aforesaid Certificates respectively, and eligible as Managers of said Company."

A resolution was thereupon adopted by the board of managers which provided that "the contributions subscribed for the aforesaid purpose shall hereafter be considered and treated as fully paid up, and * * * upon the surrender of the present certificates for cancellation, new certificates shall be issued" in the form thereby prescribed.[2]

At the annual meeting of the stockholders of the company held the same day (November 21, 1881) a resolution was unanimously adopted approving the declaration of trust and the resolution declaring the contribution fund fully paid, as passed at the meeting of the board.

From 1875 to 1881 inclusive the plaintiff company distributed to its stockholders, and from 1881 up to the present time to the owners of its certificates issued pursuant to the resolution of November 21, 1881, dividends or distributions out of earnings or profits in proportion to their respective holdings of the shares of stock or certificates issued to them by the company. From 1875 to and including 1881 the distributions to shareholders aggregated $27,000, or a yearly average of $3,857.14 plus. From 1882 to the close of the year 1912 the aggregate sum so distributed to the certificate holders was $753,000, for a yearly average of $24,290.32 plus. And from 1913 to the close of the year 1931 the aggregate sum so distributed was $1,263,000, for a yearly average of $66,473.68 plus. Sometimes these payments of net earnings to the share or certificate holders were designated on the books of the company as "dividends" and sometimes as "distributions".

[1] Minutes of the West Laurel Hill Cemetery Company, Philadelphia, Pa., Exhibit No. 6, Appendix, p. 60a.

[2] The form of the certificates as prescribed by the resolution of November 21, 1881, is as follows,—

"Whole No. of Shares 3,000

"The West Laurel Hill Cemetery Company

"This Certifies that ............ is entitled to parts or shares in the West Laurel Hill Cemetery, under the trusts declared by the West Laurel Hill Cemetery Company, Transferable only on the books of said Company, in person or by attorney on surrender of this Certificate.

"In Testimony Whereof, the West Laurel Hill Cemetery Company have caused this certificate to be signed by their President and countersigned by their Treasurer, ............ this ............ day of ............ A.D. 18...

...... Treasurer ........ President".

Notwithstanding the company's distribution of net income, as above stated, its undistributed earnings continued to increase so that, with the close of the year 1931, it had an accumulated earned surplus of more than $1,400,000.

■ As a reading of Sec. 103 (5) discloses, the exemptions thereby conferred extend to cemetery companies (1) "owned and operated exclusively for the benefit of their members", (2) "not operated for profit" and (3) "chartered solely for burial purposes as a cemetery corporation and not permitted by * * * charter to engage in any business not necessarily incident to that purpose, no part of the net earnings of which inures to the benefit of any private shareholder or individual." It has been said that the foregoing requisites are mutually independent and that a company which fulfills any one of the three requirements is entitled to exemption. Commissioner v. Kensico Cemetery, 2 Cir., 96 F.2d 594, 596. And Art. 526 of Treasury Regulations 77, promulgated under the Revenue Act of 1932, so recognizes.[3]

The taxpayer contends that it qualifies for exemption within each of the three situations specified by the pertinent sections in the Revenue Acts. The court below concluded,[4] and we think the evidence abundantly supports the conclusion, that the taxpayer fails to fulfill the requirements of any of the prescribed conditions.

■ The company was not owned and operated exclusively for the benefit of its members if members be taken to mean, as we think the Revenue Acts intend, the owners of lots or burial rights in the cemetery. Here, the owners of lots or burial rights have neither had nor have any voice in the management or operation of the company's affairs. They are not entitled to participate in, nor have they ever received, any "dividends" or "distributions" from the earnings of the company. At most they are nothing more than patrons of the sepultural facilities which the cemetery furnishes. The owners of the company's certificates, to whose large material benefit the cemetery has been operated over the years, are not the members contemplated by the exemption provisions, found in the Revenue Acts, with respect to cemetery companies.

■ The taxpayer corporation has been operated for profit. A glance at its financial history leaves no doubt of that. With its relatively small originally contributed capital and with additional lands purchased from earnings, it distributed from 1875 to 1931 to the holders of 3,000 shares or certificates of $50 par each (all of which were subscribed but not fully paid for) a grand total of $2,043,000 for an average annual dividend for the period of time involved of $12 plus per share or certificate. At the same time it accumulated an undis-

---

[3] Treasury Regulations 77, Art. 526, reads as follows:

"Art. 526. Cemetery companies.—A cemetery company may be entitled to exemption—

"(1) If it is owned by and operated exclusively for the benefit of its lot owners, or

"(2) If it is not operated for profit.

"Any cemetery corporation chartered solely for burial purposes and not permitted by its charter to engage in any business not necessarily incident to that purpose, is exempt from income tax, provided that no part of its net earnings inures to the benefit of any private shareholder or individual. A cemetery company which fulfills the other requirements of the Act may be exempt, even though it issues preferred stock entitling the holders to dividends at a fixed rate, provided that its articles of incorporation require—

"(1) That the preferred stock shall be retired at par as soon as sufficient funds are realized from sales, and

"(2) That all funds not required for the payment of dividends upon or for the re-

tirement of preferred stock shall be used by the company for the care and improvement of the cemetery property."

The exception conceded by the above Regulation where a cemetery company which otherwise fulfills the requirements of the Act has issued preferred stock entitling the holders thereof to dividends, at a fixed rate is not presently material. Not only has the instant taxpayer not issued preferred stock with a fixed dividend rate but such an issue, where present, must meet certain conditions, both as to the stock's retirement and as to the use of the funds realized from sales, which are not met by the stock or certificates which the taxpayer issued.

[4] The opinion below was filed in the case of West Laurel Hill Cemetery Co. v. McLaughlin, former Collector, and West Laurel Hill Cemetery Co. v. Ladner, Collector, D.C., 44 F.Supp. 63, where the taxpayer's right to exemption from income tax liability under a provision as to cemetery companies in the Revenue Act of 1928 was involved.

tributed earned surplus of $1,400,000. The appellant cites and relies upon Trinidad v. Sagrada Orden, etc., 263 U.S. 578, 581, 44 S.Ct. 204, 205, 68 L.Ed. 458, where the Supreme Court said that, "Evidently the exemption is made in recognition of the benefit which the public derives from corporate activities of the class named, and is intended to aid them when not conducted for private gain." In the Sagrada case, which involved a claim by a taxpayer to exemption as a corporation "organized and operated exclusively for religious, charitable, * * * or educational purposes" etc., no individual had a personal interest in or pecuniarily benefited from the operation of the company. True enough, the fact that a cemetery company operates at a profit does not ipso facto deprive it of its right to exemption. But if it has earnings and desires to maintain an exemption status, it must use all such income exclusively for the promotion and maintenance of the cemetery purposes for which it was created. Manifestly the instant taxpayer has not done that.

■ Finally, while the taxpayer was chartered solely for burial purposes as a cemetery company and was not permitted by its charter to engage in any business not necessarily incident to that purpose, it can hardly be said that its net earnings did not enure to the benefit of any private shareholder or individual. We have already pointed out the large gain the certificate holders have derived from the operations of the cemetery. The appellant urges, however, that since 1881 the distributions made to certificate holders have been in repayment of the contributors' original outlay for the land conveyed to the company. It bases this contention on the provision in the so-called declaration of trust that the distributions to certificate holders should be "the consideration for the conveyance of the said premises to the said Company." But that provision is wholly incapable of creating a condition contrary to the fact. The land had long since been paid for. The books of the company so indicate. Nor did the distributions bear any relation to the discharge of a liability for the cost of the land, nor were they on the basis of a fixed percentage of the sale prices of the lots. The distributions to the certificate holders have come from the commingled surplus earnings of the company after payment of all operational expenses and after setting over to the permanent fund ten per cent of the residual earnings and a discretionary amount not to exceed ten per cent to the contingent fund. The appellant concedes that the "organization was somewhat muddled insofar as the legal situation was concerned" but argues that "this muddling was cured in 1881" by the declaration of trust. The fact is that the corporation was operated after the declaration of trust, just as before, for the pecuniary advantage of the company's certificate or share holders. There was no change whatsoever so far as material benefit of the individual certificate holders was concerned.

In Smith v. Commissioner, 3 Cir., 69 F. 2d 911, this court held one of the taxpayer's certificate holders liable to return as taxable income a distribution received by her from the cemetery company in 1929. The particular certificate holder claimed that the distribution was a deferred payment for the sale of the land to the cemetery company and therefore not a dividend as defined in Sec. 115 of the Revenue Act of 1928, 26 U.S.C.A. Int.Rev.Acts, page 384. While the cemetery company's right to exemption was not involved in that case, nor was the company a party to or represented in the proceeding, the ruling that payments by the company to its certificate holders were distributions of earnings from operations and not returns for advancements of capital was germane to the decision. Under the facts here present, there is no valid reason for holding any differently in the instant case where the cemetery company's rights are directly in issue.

The cases cited by the appellant are not in point. In Commissioner v. Kensico Cemetery, cited supra, a cemetery company, as authorized by a New York statute, acquired lands for burial purposes by agreeing to pay as the purchase price one-half of the proceeds from the sale of burial lots plotted from the land. The Court of Appeals held that the certificates issued by the cemetery company to the grantors in payment for the land were in reality only certificates of indebtedness entitling the holders thereof to share in one-half of the proceeds from the sale of burial lots if and when such sales were made. That is not this case. In Forest Lawn Memorial Park Association, Inc., v. Commissioner, 45 B.T. A. 1091, the petitioner, a non-profit organization, was incorporated for the purpose of "operating and managing memorial park cemeteries" and, for that purpose, was authorized to acquire and sell lands and do

"all things necessary for, incident to, or convenient in the interring of the human dead." The by-laws of the company required the accumulation of net profits or their use for the improvement of the property or the benefit of the Association. The earnings could not be distributed to any individual or corporation. The Board of Tax Appeals held the petitioner to be a cemetery company exempt from taxation under the Revenue Acts because it served the predominant purpose of its incorporation and used any net profits derived from its activities for the advancement of its corporate purpose, no part of its net earnings enuring to the benefit of any private individual or shareholder.

The several judgments appealed from are affirmed.