**PURITAN LAWN MEMORIAL PARK
CEMETERY, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 154–85T.

United States Claims Court.

July 22, 1988.

Philip M. Cronin, Boston, Mass., for plaintiff. Withington, Cross, Park & Groden, Boston, Mass., of counsel.

William K. Drew, for defendant, with whom were Gerald B. Leedom, Mildred L. Seidman, and William S. Rose, Jr., Asst. Atty. Gen., U.S. Dept. of Justice, Washington, D.C.

## OPINION

ROBINSON, Judge.

This is a suit under Section 7422 of the Internal Revenue Code (IRC) for the refund of income taxes and interest totalling approximately $120,000 assessed against and collected from plaintiff, Puritan Lawn Memorial Park Cemetery (Puritan), with respect to the years 1977, 1978, 1979, and 1981. The matter is before the court after a trial on the merits and the filing by the parties of post-trial briefs. The court finds that the plaintiff has failed to show that it is entitled to tax exempt status under Section 501(c)(13) of the IRC of 1954 for the years in question. Therefore, the recovery of tax refunds for those years must be denied. The reasoning of the court follows.

### Procedural Background

Puritan was organized in 1934 as a corporation under the laws of Massachusetts and was controlled by the owners of Endicott Associates, Ltd. (Endicott), a for-profit corporation which was also incorporated under the laws of Massachusetts in 1934.

Puritan received a letter ruling of the Internal Revenue Service dated February 23, 1943, under Section 101(5) of the IRC of 1939, now Section 501(c)(13) of the IRC of 1954, granting it tax exempt status. However, on August 5, 1969, the IRS revoked Puritan's exempt status, effective January 1, 1964, "and for all subsequent years," because Puritan was "integrally affiliated with a profit corporation, serving only as agent in performing part of the cemetery's functions."

By IRS's letter dated October 1, 1973, Puritan was again recognized as an exempt organization described in Section 501(c)(13) of the IRC. That letter was supplemented by a letter dated October 26, 1973, which stated that at the end of 1969 "a reorganization has clarified the manner and extent of the operations between you and Endicott Associates, Ltd." Thus, the letter, without further clarification, advised that Puritan was entitled to recognition under Section 501(c)(13) of the IRC of 1954 "effective January 1, 1970." That recognition was reversed by the IRS's July 21, 1982 retroactive revocation letter effective January 1, 1970. The IRS required Puritan to submit for the period ending December 31, 1977, and all subsequent years, Form 1120 (U.S. Corporation Income Tax Returns). This final adverse determination was based upon the IRS's determination that an affiliated corporation, Endicott, "has an equity interest in your organization" and that "the net earnings of your corporation have inured to Endicott."

On or before May 14, 1982, Puritan, pursuant to defendant's request, filed U.S. Corporation Income Tax Returns for the calendar years 1977, 1978, and 1979, with the IRS Regional Service Center in Andover, Massachusetts. On or before September 14, 1982, Puritan, pursuant to defendant's request, filed a U.S. Corporation Income Tax Return for the calendar year 1981 with that IRS center. In these returns, Puritan maintained its tax exempt status and filed Form 1120 contingent upon final determination of that issue. Therefore, it computed no tax on these four returns.

On or before March 7, 1983, plaintiff deposited the sum of $120,000 with the

Andover IRS Service Center to stop the running of interest respecting any deficiencies assessed against plaintiff for these same four years. By notice of deficiency dated April 18, 1984, the District Director of Internal Revenue, Boston District, notified Puritan of deficiency determinations in income taxes as follows:

| Calendar Year | Deficiency Determination |
| --- | --- |
| 1977 | $ 1,348 |
| 1978 | 18,367 |
| 1979 | 4,774 |
| 1981 | 31,950 |

These amounts were assessed on or about October 11, 1984.

On or about June 22, 1984, plaintiff requested that defendant, if it had not already done so, "apply the deposit made on February 28, 1983, to the alleged tax deficiencies" with respect to calendar years 1977, 1978, 1979, and 1981 "and return the balance" to plaintiff. (Stip. para. 12; Pltf. Ex. 29.)

On June 22, 1984, Puritan filed with the IRS Regional Service Center in Andover, Massachusetts, claims for refund of the deficiencies paid by it with respect to calendar years 1977, 1978, 1979, and 1981. In addition, Puritan sought refund of the balance of the deposit made by it on or before March 7, 1983, and applied to assessed deficiencies pursuant to its request in June 1984. The claims for refund were timely filed. (Stip. para. 13; Pltf. Exs. 48–51.)

Puritan requested from defendant on June 22, 1984, a record of account as to how defendant applied the deposit to the taxes assessed for calendar years 1977, 1978, 1979, and 1981. Defendant did not respond to that request. (Stip. para. 13; Pltf. Ex. 29.) Although defendant did not respond specifically to plaintiff's letter of June 22, 1984, defendant's records show that it sent to plaintiff computer-generated notices of all adjustments to its federal income tax accounts for all of the years in suit. (Tr. 157, 161–162; Def. Exs. 1, 2, 3, 4, and 25.)

More than six months elapsed between the dates on which Puritan filed its claims for refund for calendar years 1977, 1978,

1979, and 1981, and the filing of this suit. No formal disallowance had been made by defendant with regard to Puritan's claims for refund for 1977, 1978, 1979, or 1981. No part of the deficiencies assessed and paid by Puritan for calendar years 1977, 1978, 1979, or 1981 has been repaid to Puritan. (Stip. para. 16.) This action was timely filed. (Stip. para. 15.)

### Factual Background

Since its organization on February 7, 1934, as a non-stock cemetery corporation under Massachusetts General Laws Chapter 114, Puritan has provided burial services and maintained its cemetery and grounds. Endicott is a taxable business corporation organized under Chapter 156 of these laws on January 12, 1934. Endicott's principal functions have included leasing certain property to Puritan, selling bronze markers, and acting as Puritan's agent for the purpose of selling burial lots and preset crypts.

On February 13, 1934, Editha Pierce deeded to Endicott a parcel of land containing approximately 93.2 acres on Lake Street in Peabody, Massachusetts, (Pierce Land) subject to the express condition that if any portion of the land conveyed was used for cemetery purposes, the use was to be confined to a memorial park cemetery. Also, on February 13, 1934, Puritan and Endicott entered into an agreement (the 1934 Agreement) whereby Endicott agreed to convey the Pierce Land to Puritan subject to certain conditions which it subsequently did by quitclaim deed dated February 13, 1934.

The 1934 Agreement required Endicott to use its best efforts to obtain the right to use the property known as "The Acres" owned by Editha Pierce comprising about 19 acres and adjoining the Pierce Land. If Endicott did so, the 1934 Agreement provided that Endicott was to give to Puritan the right, by sublease or otherwise, to jointly use the property for cemetery purposes "without cost or expense" so long as Puritan performed its obligations under the

1934 Agreement. Endicott later acquired The Acres and agreed that so long as the 1934 Agreement remained in effect and Puritan performed its obligations thereunder, it (i) would not sell or use the property (The Acres) for any purpose except for the development, management, and operation of the cemetery property (the Pierce Land); (ii) would convey The Acres with improvements to Puritan free and clear of mortgages (a) if the 1934 Agreement were terminated by either Endicott or Puritan at the end of 20 years (February 13, 1954) or at any time thereafter or, (b) at the expiration of the 1934 Agreement at the end of 40 years (February 13, 1974); (iii) would subdivide, develop, and improve the Pierce Land for burial purposes using 25 percent of the amounts received from Puritan with a credit to Endicott in ascertaining that percentage for sums advanced in the development work; (iv) would use its best efforts as Puritan's exclusive sales agent for the burial lots, crypts, and compartments; (v) would make up any deficit to ensure an annual contribution of $5,000 to the cemetery's perpetual care fund under certain circumstances; and, (vi) would receive from Puritan 75 percent of the total receipts from its sales for Puritan.

In consideration of Endicott's commitments under the 1934 Agreement, Puritan agreed to pay into a trust fund for perpetual care of the cemetery 20 percent of the total receipts from the sales which payments subsequently resulted in the establishment of four care trust funds to provide annual funds to pay for care of memorials, grounds, blankets, floral arrangements, and decorations. The only trustee compensation paid by the four trust care funds is paid to a corporate trustee.[1]

On December 21, 1961, Puritan and Endicott entered into a supplemental agreement (the 1961 Agreement) amending the 1934 Agreement effective January 1, 1961, reducing the sales commissions payable to Endicott and changing other financial arrangements between the parties.

In January 1969, Raymond L. Cummings was the sole surviving organizer of Puritan and was an organizer, director, and sole shareholder of Endicott. On or about January 30, 1969, he sold all of his interest in Endicott and also transferred control of Puritan to Charles A. Lowery. At that time, Lowery became the sole shareholder and an officer and director of Endicott. He continued in those positions throughout the years in suit. Also, Marion G. Lowery (Charles A. Lowery's wife) and James Ferguson became officers and directors of Endicott and served as such during some or all of the years in suit.

On or about January 30, 1969, all of the proprietors and directors of Puritan resigned and elected as their successors:

Charles A. Lowery
Marion G. Lowery
Lawrence J. Glynn (Lowery's step-son)
Carmen T. Foritano
Raymond F. Welch

These directors then appointed as officers:

Charles A. Lowery, President, Treasurer
Marion G. Lowery, Clerk
Lawrence J. Glynn, Collector

Thus, Lowery and persons related to him constituted a majority of officers and directors of Endicott and a majority of the proprietors, directors, and officers of Puritan. This remained the case during the years in suit.

On December 17, 1969, Endicott and Puritan entered into an agreement (the 1969 Agreement) that stated in part that the 1934 Agreement, as amended by the 1961 Agreement, was terminated. This action was premised, in part, upon the revocation of Puritan's tax exempt status by the IRS because of the terms of the 1934 Agreement. The 1969 Agreement also reduced the sales commission payable to Endicott to 30 percent of the sales price.

Also, on December 17, 1969, Endicott leased to Puritan a certain portion of the facilities at The Acres for $900 per month.

1. Although Charles Lowery and Lawrence Glynn served as trustees of two of these four trust funds and James W. Ferguson also served as a trustee in one of these two funds, they received no compensation for their services. Consequently, the operations of these four trust funds were and are entirely proper and therefore are immaterial to the issues in the case.

Under the lease, Puritan also paid Endicott a share of real estate taxes, utilities, heat, repairs to improvements, and insurance on improvements. The lease arrangements remained effective during the years in suit. The leased facilities included a building where meetings can be held with Puritan's clients and their families, a chapel (originally the Pierce Mansion), an office building (originally the guest house), and a service building having two floors, an attic, and a basement.

In addition, on December 17, 1969, Endicott leased to Charles and Marion Lowery, husband and wife, the mansion, and such land as necessary for the enjoyment thereof, for rent of $300 per month with Lessor to pay all heat, utilities, real estate taxes, repairs, and insurance.

On March 28, 1970, the Board of Directors of Puritan voted, upon the motion of Lowery, to set aside the agreement requiring Endicott to turn over The Acres to Puritan. At a special meeting of Puritan's Board of Directors on June 28, 1971, it voted to allow Endicott to continue owning The Acres "for an additional 40 years before being turned over to Puritan."

On October 1, 1973, the IRS restored Puritan's tax exempt status, retroactively effective as of January 1, 1970.

On February 13, 1974, Endicott and Puritan entered into an agreement (the 1974 Agreement) providing that "[f]or valuable consideration ... the Agreement dated February 13, 1934, ... is hereby extended until February 13, 2014." The Agreement, signed by Lowery on behalf of Puritan and Endicott, was effective as of the date the 1934 Agreement would have expired according to its original terms.

During the years in question, Puritan employed, *inter alia*, Charles Lowery as President/Treasurer, Marion Lowery as

Secretary, James W. Ferguson as Director/Comptroller, and Lawrence Glynn as Employee/Consultant. Endicott employed Charles Lowery as President and Treasurer, Marion Lowery as Secretary, and James Ferguson as Director/Comptroller. In general, Charles Lowery provided oversight of Puritan's premises, Glynn managed the ordinary activities of Endicott including its sales and development efforts for Puritan, and Marion Lowery performed secretarial, bookkeeping, and related services for Endicott and Puritan during the years in question.

On January 1, 1982, Puritan and Endicott entered into several agreements including a sales agency agreement and a release and termination agreement. The latter agreement stated, in part, that Puritan released to Endicott all of its rights, title, and interest in and to any and all real property owned by Endicott including The Acres, "free from any and all obligations set forth in the 1934 Agreement, as amended." It further provided, in part, "that all obligations of Puritan and Endicott under the 1934 Agreement shall cease as of January 1, 1982."

Prior to 1980, Endicott erroneously carried the Pierce Land on its books as an asset. The intercompany accounts between Puritan and Endicott showed net amounts due to "and due from" respectively, during each of the years 1977, 1978, 1979, and 1981, which related to development costs and lands of Puritan. Development costs were added to the cost of Puritan's cemetery lands and recouped as lots were sold. Endicott deducted the cost of lots sold as an expense on its financial statements and tax returns in 1977, 1978, and 1979, thereby increasing its net operating losses for tax purposes, which could be carried back or forward.[2]

2. On its 1977 federal income tax return, Endicott claimed a deduction of $8,417 as cost of lots sold, reported a net loss of $5,689, and reported no income tax due. On its 1978 return, Endicott claimed a deduction of $7,665 as cost of lots sold, reported loss of $42,305, and reported no income tax due. On its 1979 federal income tax return, Endicott claimed a deduction of $13,253 as cost of lots sold, reported a loss of $16,813, and reported no income tax due. On its 1980 return, Endicott did not claim a deduction for costs of lots sold. On page 3 of that return, under "Additional Information," line J., Endicott showed losses of $5,689 for 1977, $42,305 for 1978, and $16,813 for 1979. On its 1981 return, Endicott reported taxable income of $16,656, and reported income tax due of $2,620.

Endicott was reimbursed for cemetery development cost advances solely out of sales commissions received from Puritan. Endicott did not charge interest on money advanced to or on behalf of Puritan. Neither has Puritan charged interest to Endicott for any funds due it from Endicott, even though amounts shown as due Puritan from Endicott on the companies' financial statements for the years 1977, 1978, and 1979, were respectively $80,022, $125,489, and $209,139.[3] Puritan has not considered selling cemetery lots itself or used any other sales agent except Endicott. Lowery approved all changes in sales commission rates on behalf of both Puritan and Endicott as suggested by the companies' accountants, which were the same for both companies, allegedly without knowing the reasons for the changes.

Puritan's financial statement for 1977 shows an account receivable from L.J. Glynn in the amount of $284. The receivable from Glynn was a short-term debt that was either a loan or a payment of a personal expense by Puritan. Glynn does not recall signing a note evidencing this debt. Further, Puritan's financial statements for 1978, 1979, and 1981, all show small accounts receivable identified only as "other."

### The Issues Presented

Because this proceeding has been bifurcated on the issues of liability and damages, only liability is presently at issue. Thus, the only issues before the court for decision are:

1. Whether the plaintiff was exempt from federal income taxes during the years in suit under Section 501(c)(13) of the Code.

2. Whether the defendant made a lawful application of plaintiff's $120,000 deposit to assessed tax liabilities.

### Discussion

Section 501(c)(13) of the IRC and the Regulations promulgated thereunder exempt cemeteries from federal income taxes if they meet the requirements stated in that section and the regulations. A nonprofit mutual cemetery may be entitled to exemption (i) if it is "owned by and operated exclusively for the benefit of its lot owners who hold such lots for bona fide burial purposes and not for the purpose of resale," Tres.Reg. Section 1.501(c)(13–1(a)); and, (ii) is "chartered solely for the purpose of the burial, or (for taxable years beginning after December 31, 1970) the cremation of bodies, and not permitted by its charter to engage in any business not necessarily incident to that purpose ... provided that no part of its net earnings inures to the benefit of any private shareholder or individual." Tres.Reg. Section 1.501(c)(13–1(b)).

■ Further, no person (subject to an exception not here applicable) may have any interest in the net earnings of a tax exempt cemetery company. Tres.Reg. Section 1.501(c)(13–1(d)). That section further provides that a cemetery company is not exempt if property is transferred to such organization in exchange for an interest in the net earnings of the organization so long as such interest remains outstanding. Also, an equity interest in a cemetery company is considered an interest in the net earnings of the cemetery resulting in inurement and disqualification. *Rose Hills Memorial Pk. Ass'n. v. United States*, 199 Ct.Cl. 6, 463 F.2d 425 (1972).

■ In addition to being properly organized and operated, the cemetery must establish its exemption by filing an application with the IRS. Tres.Reg. Section 1.501(a)–1(a). The plaintiff has the burden of establishing, in a tax refund suit based upon the exemption allowed by Section 501(c)(13), that it meets all of the requirements for exemption. *See, e.g., Founding Church of Scientology v. United States*, 188 Ct.Cl. 490, 412 F.2d 1197 (1969). Fur-

---

**3.** A more complete summary of Puritan's and Endicott's financial statements which statements were nothing more than unaudited "computation reports" is deemed to be not necessary for purposes of this opinion. However, the tax returns for these companies, which were summarized in defendant's proposed findings of fact and conclusions of law, pages 26 and 27, show that Endicott's reported total tax liability for the years in question was only $2,620.

ther, provisions of the IRC granting exemptions from taxation are matters of legislative grace and are strictly and narrowly construed in favor of the government, *Weingarden v. Commissioner of Internal Revenue,* 825 F.2d 1027, 1029 (6th Cir. 1987).

█ It is well established that the determination of the commissioner (in this case, denying tax exempt status to plaintiff under Section 501(c)(13) of the Code) is endowed with a presumption of correctness. *Jupiter Corporation v. United States,* 2 Cl.Ct. 58, 61 (1983); *Welch v. Helvering,* 290 U.S. 111, 115, 54 S.Ct. 8, 9, 78 L.Ed. 212 (1933); *Montgomery Coca–Cola Bottling Co., Inc. v. United States,* 222 Ct.Cl. 356, 365, 615 F.2d 1318, 1322 (1980). To overcome this presumption, plaintiff has the burden of presenting "substantial evidence as to the wrongfulness of the commissioner's determination." *KFOX, Inc. v. United States,* 206 Ct.Cl. 143, 151–52, 510 F.2d 1365, 1369 (1975). In this case, the plaintiff must show by substantial evidence that its operations have not resulted in the acquisition by another person of an equity interest in the plaintiff or in the inurement of a benefit to another person.

In this case the defendant does not contend that the salaries paid to plaintiff's officers, directors, and employees for their services were exorbitant or that the four trusts created by Puritan and endowed for purposes of maintenance and care of the cemetery properties were in any way misused or their funds misapplied. In fact, the four trust funds were shown by credible evidence to be independent and properly operated by their respective trustees. Thus, there is no basis for concluding through the operations of these trust funds, whose assets are not carried on the plaintiff's records, that the plaintiff has violated any of the requirements of Section 501(c)(13) of the Code. *Denver United States National Bank v. United States,* 302 F.Supp. 801 (D.Colo.1965).

Since the IRS determined adversely on July 21, 1982, that plaintiff's exempt status had been revoked effective January 1, 1970, the plaintiff had to submit federal income tax returns for the calendar year ending December 31, 1977, and for all subsequent years. Since that determination had retroactive effect, the IRS has not recognized plaintiff as exempt from federal income tax for any year in suit. Thus, plaintiff was not exempt under Section 501(c)(13) during the years in suit unless it proves that the IRS determination was erroneous. The plaintiff does not here question the power of the IRS to revoke or challenge as an abuse of discretion the action of revoking retroactively a prior determination made in 1973. Therefore, the validity of the retroactiveness of the revocation is not an issue in this proceeding.

█ The plaintiff does not dispute the fact that Puritan's lot owners had no voting rights under its by-laws. In fact, Puritan's board of directors in 1971 specifically revoked whatever rights the lot owners may have had to participate in the corporate affairs of Puritan. Only directors of Puritan attended its board of directors' meetings. Although all lot owners held their lots for burial purposes and not for resale, their status permitted them no management or operational responsibilities respecting Puritan's affairs. Apparently, none of the lot owners was ever invited to participate in any way or given notice of any board of directors meetings or of any action taken by the board of directors or officers of Puritan. The lot owners received no dividends or distributions of any kind on their respective investments in their purchased lots. Therefore, on the basis of these facts alone, the defendant contends the plaintiff has not shown that Puritan can meet the qualifications of a nonprofit mutual cemetery company, citing *West Laurel Hill Cemetery Co. v. Rothensies,* 139 F.2d 50, 54 (3d Cir.1943), *cert. denied,* 321 U.S. 780, 64 S.Ct. 636, 88 L.Ed. 1073 (1944). Although it is possible that a cemetery company may still qualify as a nonprofit company without having had lot owner participation on its board, in such case it must be shown that the lot owners were not prejudiced by this fact and that notwithstanding such non-participation they received all of the benefits of the

company's operations to which they were entitled. The facts of this case do not permit such a showing.

Endicott conveyed the Pierce Land to Puritan in 1934 by quitclaim deed pursuant to the terms of the 1934 Agreement. Puritan did not pay any stated price for the land, nor did it assume any liability to pay the debt secured by Endicott's mortgage of the land to Editha Pierce. The only stated consideration for the transfer was payment to Endicott of commissions on the sale of cemetery lots, crypts, and compartments. Because Puritan since its inception has always been controlled by the owners of Endicott, Endicott has been assured of a continuing stream of commission income from the sale of lots, crypts, and compartments in exchange for the transfer of the Pierce Land to Puritan. Clearly, the transfer of the Pierce Land was not an arm's length sale. Facially, it was a contribution to capital in partial exchange for a percentage of sales proceeds, which percentage was subject to adjustment at any time by agreement of the parties. In this type of arrangement, the defendant argues, most of the traditional elements of debt are missing. In *Rose Hills Memorial Pk. Ass'n v. United States*, 199 Ct.Cl. 6, 463 F.2d 425 (1972), the *absence* of (i) an unqualified obligation on plaintiff to pay because the installments depended on the sale of grave sites, (ii) a maturity date, (iii) a sum certain, (iv) a stated interest rate, (v) a minimum annual payment, (vi) a right to share in the assets, (vii) paid-in capitalization of the business, and (viii) control over operations, resulted in a determination by the court that no debt but only an equity interest was created. Applying these factors to this case compels a similar finding respecting the Pierce Land transaction between Endicott and Pierce, as described in the 1934 Agreement. *See also Restland Memorial Park of Dallas v. United States*, 509 F.2d 187 (5th Cir.1975); *Knollwood Memorial Gardens v. Commissioner*

*of Internal Revenue*, 46 T.C. 764 (1966); Rev.Ruling 77–70, 1977–1 Cum.Bull. 150.

The plaintiff's evidence respecting the 1934 Agreement was both confusing and contradictory. The 1934 Agreement, according to its terms, was intended to be in effect for a period of 40 years or until February 13, 1974. However, almost immediately after revocation of Puritan's tax exempt status, Endicott and Puritan, on December 17, 1969, entered into an agreement purporting to terminate the 1934 Agreement. There is no evidence of record that the purported termination changed the operational relationship between those entities. Thus, Endicott continued to serve as Puritan's sales agent on a commission basis and to perform the development function. After Puritan regained its tax exempt status on October 1, 1973, Puritan and Endicott, completely ignoring the December 17, 1969 Agreement, entered into an agreement on February 13, 1974, extending the 1934 Agreement for another 40 years. The 1969 and 1974 Agreements are patently inconsistent. However, after the 1974 Agreement was executed, the parties treated the 1974 Agreement as being the only effective one. Under the 1969 Agreement, Endicott was merely to be a sales agent for Puritan and was to have no other obligations, yet under the 1934 and 1974 Agreements Endicott clearly had significant development duties involving Puritan's cemetery lands, which duties according to witness Glynn's testimony extended through 1981.

Plaintiff argues that the 1974 Agreement was a mutual mistake and should be "reformed." However, Charles Lowery, who signed the 1974 Agreement on behalf of Puritan and Endicott, presented no clarifying testimony regarding the intent of the parties in executing the 1974 Agreement. In these circumstances the plaintiff's argument is simply not persuasive. In fact, the particular chronological order[4] of the signing of these agree-

4. The IRS revoked Puritan's exemption on August 5, 1969, because Puritan was "integrally affiliated" with Endicott. Four months later, Puritan and Endicott executed the 1969 Agree-

ment and plaintiff sought to have its tax exemption restored. On October 1, 1973, the IRS issued a new exemption ruling to plaintiff based on the reorganization at the end of 1969. Four

ments in relation to the prior IRS rulings on plaintiff's tax exempt status would indicate that the plaintiff's motivation for the 1969 Agreement was in large measure directed toward satisfying the IRS that the impermissible "integral affiliation" between Endicott and Puritan which formed the basis for the August 5, 1969 revocation had ended. The defendant contends that the 1969 Agreement constituted an effort on the part of Endicott to convincingly distance itself operationally from Puritan which effort was countermanded by the 1974 Agreement once Puritan had obtained a new exemption ruling. This argument is persuasive. The court finds on these facts that the 1934 Agreement during the years in suit was legally in effect between these parties because of the 1974 Agreement. Clearly, Endicott continued without interruption to receive a substantial percentage of the sales price of cemetery lots from 1934 on through at least the end of 1981. The plaintiff has failed to show that this arrangement did not result in the creation and continuation of a prohibited equity interest in Endicott. *Rose Hills Memorial Pk. Ass'n. v. United States,* 199 Ct.Cl. 6, 463 F.2d 425 (1972).

The defendant argues further that the conduct of Puritan and Endicott respecting the handling of development costs created an impermissible equity interest in Puritan. Unquestionably, Endicott performed all development work at its own expense whether or not required by the 1934 Agreement or any subsequent agreement. Endicott and Puritan erroneously accounted for these expenditures on their financial statements before 1980. In 1980 and 1981, however, these development costs by Endicott were shown as a liability of Puritan to Endicott on the financial statements of both companies which liability was not evidenced by any debt instrument, incurred no interest, had no maturity date, and provided for no repayment schedule. Endicott admits that it recouped these expenditures, which through December 31, 1979, amounted to a total of approximately $420,363,

only through percentages of the sale prices of cemetery lots and crypts. Thus, defendant contends, under *Rose Hills, Restland,* and *Knollwood,* the creation of an equity interest in Endicott through this development arrangement also disqualified Puritan from exception under Section 501(c)(13) of the Code.

The plaintiff counters that through this arrangement Puritan was not loaning money to Endicott, Endicott incurred the expenses of developing Puritan's lands, that *ultimately* Endicott's money was spent on such development costs, that Puritan alone benefitted from those expenditures, and that Endicott realized no profit from those expenditures. Thus, plaintiff contends that such advances are no source from which the government can argue private inurement. The plaintiff also states that the erroneous accounting for the Puritan lands on the books of Endicott was done because Endicott paid the development costs to develop Puritan's cemetery lands and that the "accounting error" relating to these development costs was corrected and Endicott's tax returns corrected to reflect these changes.

The burden is upon the plaintiff to establish that the advancement by Endicott of all development costs to Puritan and the recoupment process involving the commission sale of lots, crypts, and memorials did not result in the creation of an impermissible equity interest in Endicott. The evidence submitted by the plaintiff in this regard is not conclusive and not persuasive to the court. The plaintiff's witnesses testified that Endicott made no profit from its development work for Puritan, but submitted no financial analysis to support that statement. From the evidence submitted by the plaintiff, the court cannot find that the plaintiff made no profit on its development work. It is quite possible that over the years, the sales commissions paid to Endicott permitted Endicott an unreasonable profit on its development work for Puritan. Certainly, Endicott had it in its

months later, Puritan and Endicott entered into the 1974 Agreement extending the reputedly revoked 1934 Agreement.

power to obtain profits on its development work for Puritan in any amounts it wished simply by increasing or decreasing the agreed upon commission rate applicable to its sales function. The court finds, therefore, that the plaintiff has failed to establish by a preponderance of the evidence that Endicott's development work for Puritan did not result in the creation of an impermissible equity interest in Puritan in contravention of the requirements of Section 501(c)(13) of the Code.

### The Acres

The undisputed facts show that Puritan, under the 1934 Agreement, was entitled to joint use of The Acres for cemetery purpose "without cost or expense." After December 1969, however, and throughout the years in suit, Puritan paid rent to Endicott for use of facilities at The Acres and paid a share of insurance, utilities, and taxes on The Acres. This requirement by Endicott of rent payments from Puritan amounting to $10,800 per year in 1969, which subsequently may have increased to $25,500 per year, was in direct conflict with the rights of Puritan under the 1934 Agreement to joint use of The Acres without cost or expense. Plaintiff contends that Endicott's rent charge was "reasonable." If the 1934 Agreement, pursuant to the extension of that agreement in 1974, is in effect and represents a binding legal obligation upon Endicott, it would be immaterial that the amount of rent charged by Endicott might otherwise, in the absence of the rights accorded by the 1934 Agreement to Puritan, be considered "reasonable" for Puritan's joint use of The Acres. But *no* amount of rent would appear to be reasonable under the circumstances here shown to exist.

Under the 1934 Agreement, Puritan was to receive title to The Acres free and clear if this agreement were terminated after at least 20 years (after February 13, 1954) or upon expiration of the agreement at the end of its 40–year term (on February 13, 1974). Endicott has never conveyed title to The Acres to Puritan. The defendant contends that The Acres is a very valuable piece of property consisting of over 19 acres of land near Boston, zoned residential, and having at least three substantial buildings, including a mansion. Clearly, Endicott has not complied with this contractual obligation under the 1934 Agreement to convey all of The Acres to Puritan upon expiration of the 40–year term. The 1974 extension Agreement recited no monetary consideration for the extension which apparently was interpreted as relieving Endicott of its legal obligation to convey The Acres to Puritan. Endicott continues to charge Puritan a substantial amount of rent for its use of The Acres. Moreover, Endicott has collected rent from Lowery of $300 per month for his occupancy of the mansion at The Acres. None of this rent has ever been paid or credited to Puritan.

The court is persuaded, on the basis of these facts, that Endicott has held and continues to hold The Acres for its own benefit, that Puritan's rights under the 1934 Agreement have been and continue to be disregarded to its detriment and unfortunately, to the detriment of the non-voting lot owners of Puritan who could have benefited substantially by full recognition of Puritan's rights and the proper management of Puritan's interest in The Acres. Puritan, had it received clear title to The Acres in 1974, could have sold or otherwise disposed of that part of The Acres not needed for its cemetery operation. At the least it could have received all of the rent from the lease of the mansion. However, since Endicott has exercised control over Puritan through Endicott's owner's management and control of Puritan, Puritan has had its rights under the 1934 Agreement abrogated. The court finds that such abrogation has caused an inurement of benefit to Endicott and its owners in violation of Section 501(c)(13) of the Code.

The defendant contends that impermissible inurement has occurred in other ways as a result of control of Puritan by Endicott through Lowery. The defendant relies upon two cases decided under Section 501(c)(3) of the Code since both prohibit inurement to a private individual regardless of whether the individual is a shareholder in the organization. *John Marshall*

*Law School v. United States,* 81–2 U.S.T. C. para. 9514 (Ct.Cl. Trial Div., June 24, 1981), *aff'd.* 228 Ct.Cl. 902 (1981); *Founding Church of Scientology v. United States,* 188 Ct.Cl. 490, 412 F.2d 1197 (1969). The benefit need not be great. *Spokane Motorcycle Club v. United States,* 222 F.Supp. 151 (E.D.Wash.1963).

In the case at bar, the Vice President of Endicott in charge of development of Puritan's lands, Mr. Lawrence Glynn, received a loan from Puritan of approximately $300 which he later repaid. Apparently, this extension of unsecured credit to a third party was not an isolated incident since Puritan's financial statements for 1978, 1979, and 1981 show accounts receivable identified only as "other." It is reasonable to conclude that these entries indicate an on-going policy of making similar small loans to unidentified third parties since these accounts receivable would not represent income accounts from sales of lots and crypts, Puritan's only source of income. These loans considered together represent evidence of inurement to the individuals involved which is prohibited. The plaintiff has failed to persuade the court that such loans do not fall within the category of inurements to private individuals. Collectively, they appear to be an integral part of a pattern of conduct which suggests that Puritan has been uniformly operated and managed by Lowery for the benefit of Endicott and its sole owner, Lowery.

Endicott admits that it claimed improper deductions on its tax returns of expenses incurred by Puritan in 1977, 1978, and 1979 with respect to lot sales. However, Endicott failed to show through satisfactory or convincing evidence that Endicott ever filed any amended returns. Plaintiff's witness,

Anspach,[5] testified only that the error was subsequently corrected on the books of Endicott and Puritan. He did not testify that amended returns had in fact been filed. It is possible that these improper deductions taken before 1980, by increasing Endicott's losses for the years involved, resulted in gain to Endicott of an undetermined amount. In fact, some gain could have inured to Endicott's benefit even if Endicott subsequently filed amended returns correcting the deficiency in its taxes since Endicott may have had the use of these funds interest free for the periods in question. In any event, Endicott, by its control of Puritan through functionally integrated management of the two companies, was able to take maximum advantage of these losses for many years without any question being raised by anyone.[6]

It is possible that these tax losses, which may be carried forward as an offset in future years, were improperly taken by Endicott during the years prior to 1980 and resulted in the inurement to Endicott and to its owner of a benefit in contravention of and inconsistent with the requirements of Section 501(c)(13) of the Code.

*The Application of the $120,000 Deposit to Tax Liabilities Assessed Against Plaintiff with Respect to Years 1977, 1978, 1979, 1981, 1982, 1984*

This proceeding has been bifurcated on the issues of liability and damages. Therefore, only liability is in issue at present. The question to be resolved by the court now respecting the $120,000 deposit in the nature of a cash bond is whether defendant made a lawful credit of amounts in issue to tax years 1982 and 1984 entitling it to claim part payment of the amounts sought by the

---

5. William N. Anspach's testimony was particularly unpersuasive and lacking in credibility because his firm, which performed no audits of any financial report of Puritan and Endicott (Tr. 39) allowed the Pierce Land to be erroneously carried on Endicott's books during the years it acted as Puritan's accounting consultant (Tr. 41). Anspach could not recall if amended returns were ever filed for Endicott to correct Puritan's erroneous expense deductions which should have been Puritan's (Tr. 42) and Anspach's testimony indicated confusion as to what properties were owned by and leased to

Puritan (Tr. 43–45), whether the 1934 Agreement was in effect during the years 1977–81 (Tr. 47) and what development work Endicott performed (Tr. 50).

6. During the four years in suit, Puritan and Endicott had a combined total taxable income of $145,361. Their reported federal income tax liabilities on that amount was only $2,620. This is persuasive evidence that the inter-company transactions have not been at arm's length.

plaintiff. Determination of what amount, if any, may be due plaintiff is reserved for the liability stage of these proceedings.

The plaintiff's contentions relating to this issue are that:

1. The amount of the deposit ($120,000) exceeded the assessed tax deficiency.

2. The plaintiff requested on June 22, 1984, the refund of the deficiencies paid for 1977, 1978, 1979, and 1981, and the return of the balance of its $120,000 deposit.

3. Rev.Proc. 82–51 (superceded by Rev. Proc. 84–58) and Rev.Ruling 58–239 *required* return of this balance to plaintiff.

4. The IRS misapplied the deposit to years 1982 and 1984 because the plaintiff had filed a claim for refund, thereby taking away from the IRS any discretion to apply any of the deposit to these two years, citing *Acker v. United States*, 519 F.Supp. 178, 182 (N.D.Ohio 1981).

The defendant's contentions regarding this issue are that:

1. Rev.Proc. 82–51, which governed deposits in the nature of cash bonds with respect to prospective deficiency notices in 1983, provided that all or part of such a deposit would be returned, without interest, upon request by the taxpayer at any time before assessment unless, among other things, the IRS determined that the amount should be applied against any other liability, in which case, the deposit would be applied against such other liability.

2. Total assessed deficiencies of $56,439 for the years 1977, 1978, 1979, and 1981 were noticed to plaintiff on April 18, 1984.

3. The balance in favor of plaintiff, the amount in excess of the assessed deficiencies, was therefore, $63,561 when plaintiff, on or about June 22, 1984, requested the IRS to return the balance.

4. IRS net assessments made and outstanding against plaintiff's accounts for the years 1977, 1978, and 1981 (but not made subject to formal deficiency notices) totalled $89,312.98 on June 22, 1984.

5. Because of those net assessments, under Section 6402 of the Code and Rev. Proc. 82–51, on June 22, 1984, no amount was due to be returned to plaintiff. IRS was entitled to apply to plaintiff's accounts for 1977, 1978, and 1981 the full amount of the $120,000 as a payment of tax on June 22, 1984.

6. Subsequent abatements of tax and additions thereto created credit balances in the accounts for certain of the years in suit.

7. When subsequent abatements of tax and of additions thereto created credit balances in the accounts for certain of the years in suit, those balances became overpayments of tax and were subject to being refunded or credited to any outstanding tax liability in accordance with Section 6402 of the Code and the Regulations promulgated thereunder.

8. As a result of abatements for tax year 1978 and the crediting of plaintiff's accounts for tax years 1982 and 1984, plaintiff received refunds of $3,137.37 on November 12, 1984, and of $147.67 on August 5, 1985.

9. Defendant's evidence (IRS records and testimony) shows the IRS routinely sent computer-generated notices to plaintiff with respect to all adjustments to its accounts for the years in issue.

10. Under a proper reading of *Acker*, defendant had the authority, if not the duty, under Section 6402(a) of the Code and applicable Regulations, to make these adjustments in plaintiff's account.

■ The court has carefully considered the arguments of the parties regarding the defendant's crediting of a part of the $120,000 in issue to plaintiff's account for 1982 and 1984. The court is persuaded that the IRS was within its discretion in applying at plaintiff's request the $120,000 deposit to the plaintiff's accounts for the years 1977, 1978, 1979, and 1981. Further, the defendant acted properly in crediting overpayments arising from abatements on plaintiff's accounts for certain years in suit to plaintiff's accounts for the years 1982 and 1984, thus offsetting some of plaintiff's liabilities for those years as well. Section 6402(a) of the Code; Treas.Regs. Sec. 301.6402–3(a)(b); Rev.Procedure 82–51. Thus, the amounts of $12,000 credited to plaintiff's 1982 account (of which

$3,137.37 was refunded on November 12, 1984) and of $3,990.89 credited to plaintiff's 1984 account have been paid to or on the account of plaintiff by defendant. However, from the evidence presented, the court has reached no determination, notwithstanding such lawful crediting of plaintiff's accounts for all of the years in question, whether the plaintiff is yet entitled to any *further* credit or refund. The defendant's brief suggests that the defendant is willing to negotiate with the plaintiff regarding whether any part of the $120,000 in issue remains due and owing to plaintiff. However, the plaintiff's reply brief ignores this suggestion.

### Conclusion

The court is acutely aware that the lot owners, unfortunately, will suffer the consequences of the court's adverse findings in this proceeding. Therefore, their interests have been given due and careful consideration in this court's determination of the issues in this case. Obviously, such lot owners must bear the ultimate financial consequences of the court's decision that Puritan has *not* been shown to be entitled to exempt status pursuant to the provisions of Section 501(c)(13) of the Code and Treas. Regs. Sec. 1.501(c)(13)-1(d). In summary, the court concludes that the plaintiff has failed to prove each element of the requirements for exemption.[7] Thus, the IRS has not been shown to have erroneously determined that plaintiff was not exempt during the years in suit.

With respect to the proper amount of corporate taxes due for those years, the plaintiff may be entitled to some refund from its $120,000 deposit. Thus, the Court has not concluded that the plaintiff has no recovery due it since the element of damages has not been determined. Further proceedings will be necessary to determine whether the plaintiff is entitled to any refund from the $120,000 deposit in the event that the parties are unable to resolve this question through an agreement and stipulation. Finally, it should be noted that the above findings of the court are without prejudice to the plaintiff's right to apply for exempt status after it has made appropriate changes in its relationship to Endicott and methods of operations.

---

**7.** Lowery's testimony was unpersuasive and lacking in credibility because (i) although Puritan paid frequently varying sales commissions which ranged from 15 to 50 percent, he could not describe the amounts of these commissions for any of the years in suit (Tr. 96). He admitted no lot owners attended any board meetings of Puritan (Tr. 105); he could recall no specifics of the 1969 Agreement which purportedly terminated the 1934 Agreement (Tr. 105); he admitted Puritan never used any sales agent other than Endicott, and his testimony on deposition and at trial conflicted as to whether Puritan ever gave consideration to hiring any other sales agent. Lowery was president of both Endicott and Puritan. He personally approved all changes in sales commissions payable to Endicott (Tr. 109). In summary, Lowery's testimony fully supports other credible evidence of record indicating that he exercised his personal control of Puritan's board through the service and membership of his family, including his wife and stepson, to the advantage of Endicott, which he owned in its entirety and that such actions constituted a prohibited inurement of benefit and gain to Endicott in contravention of IRC Section 501(c)(13).

Glynn's testimony failed to show that the rents payable by Puritan were reasonable and proper. He could not recall the annual rental rate (Tr. 75). The Court was not persuaded by his testimony that the money he received from Puritan did not constitute a non-interest loan which inured to his benefit until repaid. Further, The Acres is zoned residential (Tr. 85). Consequently, if title were passed to Puritan pursuant to the terms the 1934 Agreement, at least some portion of it could be developed for the benefit of the lot owners.